THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. ADRIAN P. BALDWIN, Defendant-Appellee.

Third District   No. 3—08—0118

Opinion filed March 23, 2009.

James Hoyle, State's Attorney, of Macomb (Terry A. Mertel and Judith Z. Kelly, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Verlin R. Meinz, of State Appellate Defender's Office, of Ottawa, for appellee.

PRESIDING JUSTICE O'BRIEN delivered the opinion of the court:

The defendant, Adrian P. Baldwin, was charged with unlawful possession of drug paraphernalia (720 ILCS 600/3.5(a) (West 2006)). The defendant filed a motion to suppress evidence, which the circuit court granted. On appeal, the State argues that the circuit court erred when it granted the defendant's motion to suppress. We affirm.

FACTS

On July 28, 2007, McDonough County deputy sheriff Mike Pilat initiated a traffic stop of a vehicle driven by Curtis Baldwin, but owned

by his wife. Pilat had observed the vehicle make two lane violations. The defendant, who was 17 years old at the time, was seated in the front passenger seat, and a minor female was seated in the backseat.

Pilat approached the driver's side of the vehicle, and a reserve officer approached the passenger side of the vehicle. Pilat began talking to the defendant while the reserve officer shined his flashlight into the vehicle. Pilat obtained the driver's information, then asked the passengers for identification. The passengers did not have any identification, so Pilat asked for and received the passengers' names. Pilat testified that the defendant mumbled his name to Pilat, resulting in Pilat having to ask more than once for the defendant's information. Pilat also had to ask more than once for the minor female's name. Pilat testified that, although he smelled a faint odor of alcohol coming from the vehicle, he did not smell alcohol on the breath of the driver or the passengers. He did not smell any odor of cannabis.

Pilat also testified that the defendant began breathing heavily when Pilat asked for the defendant's name. According to Pilat, the defendant appeared nervous and would not look at Pilat, although Pilat admitted that the defendant might have been distracted by the reserve officer. The defendant also kept his right hand at his side, along the seat. Pilat testified that he thought the defendant might be hiding something in his hand. On cross-examination, Pilat stated that he also thought that the defendant might have a weapon in his hand, although he did not inquire about the defendant's hands, nor did he frisk the defendant.

A videotape of the stop was admitted into evidence at the suppression hearing. The tape began with the vehicle already at a stop. Within two minutes of the beginning of the tape, Pilat had obtained the driver's and passengers' information and returned to his squad car, at which point Pilat turned off his microphone. Approximately 2½ minutes later, Pilat returned to the vehicle and began talking to the defendant. Nothing on the videotape indicated that any issue arose with the information run by Pilat. Likewise, at the suppression hearing, no evidence was introduced to indicate any issue arose with the information run by Pilat.

Approximately 40 seconds after returning to the stopped vehicle, Pilat asked the driver to step out of the vehicle, and Pilat and the driver began having a conversation at the rear of the vehicle. Because Pilat's microphone was still off, there was no audio of the conversation on the tape of the stop.

Pilat testified that he asked the driver about the odor of alcohol coming from the vehicle. The driver explained that he had been sober for approximately 10 or 11 years. The driver also explained that he

had been playing in a band at a benefit being held at a bar that night, and he noticed an odd odor coming from the vehicle when he and the passengers were leaving the bar. The vehicle was a convertible; at the time it was parked in the bar's lot, the top was down. When the stop was made, the top was up.

During the conversation, Pilat asked the driver for consent to search the vehicle numerous times, with multiple requests being made because the driver would not give a yes or no answer. Pilat testified that the driver refused to give consent. The driver testified that Pilat was "adamant" when asking for consent and persisted even though the driver told Pilat that there was no reason to search the vehicle.

At some point while he and the driver were talking at the rear of the vehicle, Pilat claimed that he saw the defendant turn around, look in the direction of Pilat and the driver, reach into his pocket, and reach down along his side.

Eventually, the conversation moved to the passenger side of the vehicle, where the tape shows the driver briefly talking to the defendant, then Pilat briefly talking to the defendant while shining his flashlight into the vehicle. The conversation moved back to the rear of the vehicle, and Pilat asked the driver to return to the vehicle and wait, as Pilat was going to request a canine to perform a sniff of the vehicle. After the approximately 3-minute, 15-second conversation outside the vehicle, the driver sat back down in the vehicle. At this point, approximately nine minutes had passed since the time at which Pilat's camera began recording.

Approximately 30 seconds later, Pilat called to request a canine unit. The tape indicated that the canine unit arrived approximately two minutes later. When the sniff was completed, approximately 14 minutes had passed since the time at which Pilat's camera began recording.

The dog allegedly alerted to the vehicle, and Pilat conducted pat downs of the driver and the defendant. In the subsequent search of the vehicle, Pilat found a homemade push rod, made for cleaning cannabis out of a pipe. Pilat found the push rod on the floor by the front passenger seat. Pilat later recovered a cannabis pipe from the defendant's person.

After arresting the defendant and conducting a full search of the vehicle, Pilat gave the driver a warning for the lane violations.

During the suppression hearing, which was held on January 18, 2008, the parties contested the applicable law. The circuit court eventually agreed with the defendant that *People v. Gonzalez*, 204 Ill. 2d 220, 789 N.E.2d 260 (2003), was still good law and controlled the situation at hand. The court found that Pilat's questioning was

unrelated to the purpose of the stop. In addition, the court found that Pilat's actions of calling for a dog sniff and "further delaying this matter" were inconsistent with the purpose of the stop. Accordingly, the court granted the defendant's motion to suppress, and the State appealed.

## ANALYSIS

On appeal, the State argues that the circuit court erred when it granted the defendant's motion to suppress. Specifically, the State argues that the officer did not unreasonably delay the traffic stop. Alternatively, the State argues, without citation to any authority, that any delay was justified by a reasonable, articulable suspicion of criminal activity.

We employ a two-part standard of review when faced with a challenge to a circuit court's ruling on a motion to suppress. *People v. Luedemann*, 222 Ill. 2d 530, 857 N.E.2d 187 (2006). First, we review the circuit court's findings of historical fact for clear error, and we afford deference to any inferences the circuit court drew from those facts. *Luedemann*, 222 Ill. 2d 530, 857 N.E.2d 187. We will not disturb the circuit court's factual findings unless they are against the manifest weight of the evidence. *Luedemann*, 222 Ill. 2d 530, 857 N.E.2d 187. Second, because a reviewing court is free to assess the facts relative to the issue presented in the case, we review the circuit court's ultimate legal ruling on the motion to suppress *de novo*. *Luedemann*, 222 Ill. 2d 530, 857 N.E.2d 187.

The fourth amendment of the United States Constitution and article I, section 6, of the Illinois Constitution guarantee citizens the right to be free from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, §6. The driver of a vehicle, and any passengers within the vehicle, are subjected to a lawful seizure when a police officer initiates a traffic stop of the vehicle based on probable cause. *Brendlin v. California*, 551 U.S. 249, 168 L. Ed. 2d 132, 127 S. Ct. 2400 (2007); *People v. Harris*, 228 Ill. 2d 222, 886 N.E.2d 947 (2008). Nevertheless, an initially lawful seizure can become unlawful if subsequent police conduct violates the fourth amendment's reasonableness standard. See, *e.g.*, *Illinois v. Caballes*, 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834 (2005); *People v. Jones*, 346 Ill. App. 3d 1101, 806 N.E.2d 722 (2004).

Traditionally, many courts, including Illinois courts, have analyzed routine traffic stops under the principles set forth in *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). *People v. Cosby*, 231 Ill. 2d 262, 898 N.E.2d 603 (2008). Under *Terry*, the reasonableness of police action taken during an investigative detention involves a

dual inquiry: (1) whether the officer's action was justified at its inception; and (2) whether the officer's action was reasonably related in scope to the circumstances which justified the interference in the first place. *Terry*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868. In the traffic stop context, an officer's observation of a traffic violation constitutes probable cause and satisfies *Terry*'s first prong. See, *e.g.*, *People v. Jones*, 215 Ill. 2d 261, 830 N.E.2d 541 (2005). The second prong of the *Terry* analysis, which has come to be called the scope inquiry, has been the subject of much debate.

In *Gonzalez*, 204 Ill. 2d 220, 789 N.E.2d 260, our supreme court held that the *Terry* scope inquiry contains both temporal and substantive aspects, in accord with United States Supreme Court precedent. As stated by our supreme court in a different case:

> "Under the second prong we consider the *length* of the detention and the *manner* in which it was carried out. *Gonzalez*, 204 Ill. 2d at 233. That is, ' " " 'an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop,' " ' and ' " " 'the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.' " ' *Gonzalez*, 204 Ill. 2d at 233, quoting *Florida v. Royer*, 460 U.S. 491, 500, 75 L. Ed. 2d 229, 238, 103 S. Ct. 1319, 1325-26 (1983) (plurality op.)." (Emphasis in original.) *People v. Bunch*, 207 Ill. 2d 7, 14, 796 N.E.2d 1024, 1029 (2003).

In *Gonzalez*, our supreme court developed a three-part test to determine whether an officer's questioning during a traffic stop violated *Terry*'s scope requirement. *Gonzalez*, 204 Ill. 2d 220, 789 N.E.2d 260. The first question to ask was whether the question was reasonably related to the justification for the stop; if it was, no fourth amendment violation occurred. If the question was not so related, the second question to ask was whether the officer had a reasonable, articulable suspicion to justify the question; if he did, no fourth amendment violation occurred. If the question was not independently justified, the third question to ask was whether, under the totality of the circumstances, the question impermissibly prolonged the duration of the detention or changed the fundamental nature of the stop; if the question did neither, no fourth amendment violation occurred. *Gonzalez*, 204 Ill. 2d 220, 789 N.E.2d 260.

However, in *Harris*, our supreme court stated that the United States Supreme Court's decisions in *Caballes*, 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834, and *Muehler v. Mena*, 544 U.S. 93, 161 L. Ed. 2d 299, 125 S. Ct. 1465 (2005), "unequivocally overruled" *Gonzalez* "to the extent that it holds that the reasonableness of a traffic stop

must be judged not only by its duration, but by the additional criterion of whether the actions of the officer alter the fundamental nature of the stop." *Harris*, 228 Ill. 2d at 240, 244, 886 N.E.2d at 959, 961. Furthermore, our supreme court stated that "[t]he duration prong of the inquiry predates our decision in *Gonzalez* and has been reaffirmed in both *Caballes* and *Muehler*. It, therefore, survives as the sole focus of the scope inquiry. [Citations.]" *Harris*, 228 Ill. 2d at 244, 886 N.E.2d at 961.

Our supreme court also stated that *Caballes* established two principles to guide the analysis of police conduct during a traffic stop. *Harris*, 228 Ill. 2d 222, 886 N.E.2d 947. First:

"[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution. [Citation.] A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Caballes*, 543 U.S. at 407, 160 L. Ed. 2d at 846, 125 S. Ct. at 837.

Second, police conduct does "not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner," unless that conduct itself violated an individual's "constitutionally protected interest in privacy." *Caballes*, 543 U.S. at 408, 160 L. Ed. 2d at 847, 125 S. Ct. at 837; *Harris*, 228 Ill. 2d 222, 886 N.E.2d 947.

Thus, police conduct occurring during an otherwise lawful seizure does not render the seizure unlawful unless it either unreasonably prolongs the duration of the detention or independently triggers the fourth amendment. *Harris*, 228 Ill. 2d 222, 886 N.E.2d 947. If the conduct violates either principle, the conduct must possess a separate fourth amendment justification to avoid rendering the seizure unlawful. See *Muehler*, 544 U.S. 93, 161 L. Ed. 2d 299, 125 S. Ct. 1465; *People v. Starnes*, 374 Ill. App. 3d 329, 871 N.E.2d 815 (2007).

In this case, there is no question that Pilat's questions with regard to the odor of alcohol, requests for consent to search, and calling for a drug dog did not independently trigger the fourth amendment. See *Caballes*, 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834; *Muehler*, 544 U.S. 93, 161 L. Ed. 2d 299, 125 S. Ct. 1465. The question presented to us focuses on the duration principle: whether Pilat's actions unreasonably prolonged the duration of the detention, thereby rendering the seizure unlawful.

Because the dispositive questions in *Caballes*, *Muehler*, and *Harris* involved the question of whether certain police conduct independently triggered the fourth amendment, those cases involved *Caballes'* second

principle and provide either little or no guidance on standards for the bench and bar to apply a duration-only scope inquiry. *Caballes*, 543 U.S. at 407, 160 L. Ed. 2d at 846, 125 S. Ct. at 837 ("The question on which we granted certiorari [citation] is narrow: 'Whether the Fourth Amendment requires reasonable, articulable suspicion to justify using a drug-detection dog to sniff a vehicle during a legitimate traffic stop' "; accepting state court's conclusion that the duration of the stop was proper); *Muehler*, 544 U.S. 93, 161 L. Ed. 2d 299, 125 S. Ct. 1465 (declining to address whether the duration of the detention was prolonged because the court below did not address it); *Harris*, 228 Ill. 2d at 236, 886 N.E.2d at 957 ("Defendant has not argued that the computerized warrant check, conducted at the same time as the officer's check of the status of the driver's license, unreasonably prolonged his seizure"). However, because *Harris* did use *Terry*-type language in its discussion of *Gonzalez* and the "duration prong" of the "scope inquiry" (*Harris*, 228 Ill. 2d at 244, 886 N.E.2d at 961), and because no court of primary authority has explicitly stated that *Terry* no longer applies to traffic stops in Illinois, we will continue to look to *Terry* and its progeny, when applicable, to assess the reasonableness of a detention's duration during a traffic-stop-related seizure.

Albeit not in the traffic stop context, the United States Supreme Court has twice declined to adopt a bright-line rule to indicate a fixed point at which investigative detentions become unreasonable. *United States v. Place*, 462 U.S. 696, 77 L. Ed. 2d 110, 103 S. Ct. 2637 (1983); *United States v. Sharpe*, 470 U.S. 675, 84 L. Ed. 2d 605, 105 S. Ct. 1568 (1985). Likewise, we decline to adopt any type of bright-line rule to guide our duration analysis. Rather, we will employ a contextual, totality of the circumstances analysis that includes consideration of the brevity of the stop and whether the police acted diligently during the stop. See *Sharpe*, 470 U.S. 675, 84 L. Ed. 2d 605, 105 S. Ct. 1568; *People v. Koutsakis*, 272 Ill. App. 3d 159, 649 N.E.2d 605 (1995).

In this case, Pilat stopped the vehicle after observing two lane violations. Pilat approached the vehicle, obtained the driver's and passengers' information, and became suspicious of the defendant based on nervousness, heavy breathing, and the location of the defendant's right hand. Without inquiring as to what the defendant may have had in his hand or conducting a frisk for weapons, Pilat returned to his squad car and ran the information. At this point, approximately two minutes had passed since the beginning of the recording. No evidence was presented to show that any issues arose with the running of the information. Pilat returned to the stopped vehicle 2½ minutes later. Thus, at approximately 4½ minutes into the stop, Pilat was apparently ready to conclude the initial purpose of the traffic stop.

Rather than issue a citation or warning ticket, however, Pilat spoke to the driver for 40 seconds at the vehicle, then approximately 3 minutes and 15 seconds outside the vehicle. After numerous unsuccessful attempts at obtaining consent to search the vehicle, Pilat had the driver return to the vehicle, informing the driver that he was going to call for a drug dog. Thirty seconds later, Pilat called for the drug dog. The canine unit arrived approximately two minutes later. After an explanation of what was about to occur, the officer walked the dog around the vehicle. When the sniff was completed, approximately 14 minutes had passed since the time at which Pilat's camera began recording. As previously noted, however, Pilat was apparently ready to conclude the initial purpose of the stop at 4½ minutes. Under these circumstances, we hold that the duration of the detention was prolonged beyond the time reasonably required to complete the traffic stop. See *Caballes*, 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834. Our analysis does not end there, however.

Given that Pilat's actions unreasonably prolonged the traffic stop, we must address whether those actions had a separate fourth amendment justification. See *Caballes*, 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834; *Muehler*, 544 U.S. 93, 161 L. Ed. 2d 299, 125 S. Ct. 1465. A traffic stop "may be broadened into an investigative detention *** if the officer discovers specific, articulable facts which give rise to a reasonable suspicion that the defendant has committed, or is about to commit, a crime." *People v. Ruffin*, 315 Ill. App. 3d 744, 748, 734 N.E.2d 507, 511 (2000). Here, Pilat stated he was suspicious of the defendant's nervousness, heavy breathing, and right-hand placement. There was no odor of marijuana emanating from the vehicle. While Pilat was also suspicious of the faint odor of alcohol emanating from the vehicle, he dispelled those suspicions quickly, yet persisted in his attempts to obtain consent to search the vehicle. During those attempts, Pilat alleged that he saw the defendant turn around, look in the direction of Pilat and the driver, reach into his pocket, and reach down along his side. However, we find that all of these observations essentially amount to nothing more than a hunch based on the 17-year-old passenger's nervousness. "Mere hunches and unparticularized suspicions are not enough to justify a broadening of the stop into an investigatory detention." *Ruffin*, 315 Ill. App. 3d at 748, 734 N.E.2d at 511. Under these circumstances, we hold that Pilat lacked a reasonable, articulable suspicion to prolong the detention. Accordingly, we hold that the circuit court did not err when it granted the defendant's motion to suppress.

The judgment of the circuit court of McDonough County is affirmed.

Affirmed.

LYTTON, J., concurs.

JUSTICE SCHMIDT, specially concurring:
I concur in the judgment.