#25173-a-SLZ

**2009 SD 104**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                        Plaintiff and Appellee,

    v.

HARVEY LITTLEBRAVE, JR.,                        Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT
OF THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

HONORABLE JOSEPH NEILES
Judge

* * * *

MARTY J. JACKLEY
Attorney General

JOHN M. STROHMAN
Assistant Attorney General                        Attorneys for plaintiff
Pierre, South Dakota                        and appellee.

JULIE HOFER
Office of the Public Advocate                        Attorneys for defendant
Sioux Falls, South Dakota                        and appellant.

* * * *

ARGUED ON OCTOBER 5, 2009

OPINION FILED **12/02/09**

#25173

ZINTER, Justice

[¶1.]       A highway patrolman stopped Harvey Littlebrave (Harvey) for a "lane driving" violation on Interstate 90 near Sioux Falls.  In the course of questioning Harvey and a passenger during the traffic stop, Harvey admitted possessing marijuana in the vehicle.  The trooper subsequently conducted a canine sniff and search of the vehicle yielding several pounds of marijuana.  Harvey moved to suppress, arguing that the trooper's investigatory detention unreasonably extended the traffic stop in violation of the Fourth Amendment.  The circuit court denied the motion.  We affirm.

*Facts and Procedural History*

[¶2.]       In March 2008, Highway Patrol Trooper Chris Koltz observed a Chevrolet Suburban cross the fog line on the Interstate.  The Suburban then crossed the center line, traveled between both lanes of travel, crossed the fog line again, and traveled on the shoulder of the highway.  Koltz stopped the Suburban at 9:44 p.m. and observed Harvey was driving.  Koltz also observed that the Suburban had Washington State license plates, contained numerous duffle bags in the back, and appeared "lived-in."  Mary Littlebrave (Mary) was in the passenger seat, and three small children were in the back of the vehicle.

[¶3.]       Harvey handed Koltz his driver's license, and Mary handed Koltz the rental agreement for the vehicle.  The documents were handed to the officer through the passenger side window.  According to Koltz, there was a "strong odor of a soap or chemical" coming from the vehicle.  Additionally, both Harvey and Mary shook nervously during this initial contact.  Mary shook nervously enough to drop the

-1-

rental agreement when handing it to Koltz. Koltz informed Harvey of the driving violation and indicated he was going to issue a warning ticket. Koltz also initiated routine traffic stop questions, asking Harvey if he was tired. Harvey responded that he had been driving all day. Koltz then asked Harvey to have a seat in the patrol vehicle.

[¶4.] As Koltz began to write the warning ticket, he asked Harvey about his origin and destination of travel. Harvey indicated he was driving from Washington and was going to New York to pray for a sick friend. Harvey also informed Koltz that he and his family were going to stay in New York until the following Wednesday and then fly back to Washington.

[¶5.] After asking these questions, but before completing the warning ticket, Koltz left the patrol vehicle to check the Suburban's vehicle identification number and to speak to Mary because her name was the only name on the Suburban's rental agreement. After Koltz confirmed that the vehicle number matched the rental agreement, Koltz asked Mary for identification. He also asked her about their destination and purpose of travel. Mary confirmed they were traveling from Washington to New York and they were going to meet a friend. Mary, however, stated her sister was possibly coming to New York from North Carolina. She also denied that anyone in New York was sick. She finally indicated they would be returning to Washington on Friday, as opposed to Wednesday, as Harvey had indicated.

[¶6.] At 9:52, after his discussion with Mary, Koltz returned to his patrol car and resumed the conversation with Harvey, asking follow-up questions regarding

the conflicting stories. Koltz asked: (1) what was the purpose of going to New York; (2) did Harvey's wife have family in New York; (3) what was the name of the man who was sick; and, (4) exactly where in New York was he going. Koltz specifically confronted Harvey with the fact that Mary had informed Koltz they were going to leave New York on Friday, not Wednesday. Harvey responded, stating he had to get back to work for a landscaping company so he was hoping to leave on Wednesday. The record does not, however, reflect any answers attempting to dispel the inconsistency regarding the "sick friend."

[¶7.] At 9:56, Koltz went back to the Suburban to return Mary's identification. Koltz also continued the conversation with Mary.[1] At 9:59, Koltz walked back to his patrol car and asked Harvey where he was originally from and a few other questions about the trip. At this point, approximately sixteen minutes into the stop, Koltz asked whether they had any illegal drugs in the Suburban. Harvey denied that any illegal drugs were in the Suburban. Koltz also asked his final questions about the discrepancies concerning travel. He asked about Harvey's wife's sister and where she lived. He then asked again if Harvey had any illegal drugs in the Suburban. At 10:02, Harvey denied that any illegal drugs were in his vehicle. At 10:03, Koltz asked Harvey what types of drugs were in the Suburban. At 10:04, Koltz told Harvey that Koltz was going to run a check of his driver's license and also run a drug dog around the Suburban. Koltz also told Harvey he "d[id]n't have to say anything," but if he had less than two ounces of marijuana,

---

1. The conversation was not audible. All exterior conversations were not recorded as a result of a mechanical failure.

Koltz would only write a ticket for possession of paraphernalia and let him go. Harvey admitted having a "personal amount" of drugs in the center console of the front passenger compartment. At the time of this admission, which provided probable cause for a warrantless automobile search, approximately twenty minutes had expired from the time of the stop.

[¶8.]     At 10:06, Koltz informed Harvey he "didn't have to tell [Koltz] another word," but wanted to know "how much are we talking about today"?  From 10:07 to 10:08:15 there are no audible conversations on the audio tape.  At 10:08:21, Koltz initiated a radio check of the driver's licenses.  At 10:09, a canine sniff of the vehicle was performed.  The dog alerted, and the resulting search revealed 33.71 pounds of marijuana in the duffle bags, approximately one quarter ounce of marijuana in the console, and two marijuana "joints" in the front passenger compartment.  Following the search and arrest of the two adults, Koltz finished writing the warning ticket.

[¶9.]     Before trial, Harvey moved to suppress the evidence.  The circuit court denied the motion, and Harvey was found guilty of three drug offenses.  On appeal, he concedes there was reasonable suspicion justifying the initial traffic stop.  He argues that he was unconstitutionally detained longer than reasonably necessary to effectuate the purpose of the traffic stop.

*Decision*

[¶10.]     "Constitutional challenges to a warrantless law enforcement search require a two-step inquiry:  first, factual questions on what the officer[ ] knew or believed at the time of the search and what action [he] took in response; second, legal questions on whether those actions were reasonable under the circumstances."

State v. Deneui, 2009 SD 99, ¶ 14, __ NW2d __, __ (citations omitted). "Although we defer to the circuit court's fact findings, it is our duty to make our own legal assessment of the evidence to decide under the Fourth Amendment whether the [officer's] actions were 'objectively reasonable.'" *Id.* (quoting State v. Nguyen, 2007 SD 4, ¶ 12, 726 NW2d 871, 874-75).

[¶11.] The reasonableness of Koltz's investigatory detention is judged under *Terry v. Ohio,* 392 US 1, 19-20, 88 SCt 1868, 1878-79, 20 LEd2d 889 (1968), which mandates a two-part inquiry. First, was the stop "justified at its inception." *Id.* at 20, 88 SCt at 1879. Harvey concedes the initial traffic stop was justified. Second, were the officer's actions during the stop "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* Harvey argues that Koltz's questioning was unrelated to the traffic stop. Therefore, he contends that his detention was unnecessarily prolonged, rendering it unreasonable under the Fourth Amendment.

[¶12.] A lawful traffic stop may become unlawful "if it is prolonged beyond the time reasonably required to complete" its purpose. Illinois v. Caballes, 543 US 405, 407, 125 SCt 834, 837, 160 LEd2d 842 (2005). "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. [Further], the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." State v. Ballard, 2000 SD 134, ¶ 11, 617 NW2d 837, 841 (citing Florida v. Royer, 460 US 491, 500, 103 SCt 1319, 1325-26, 75 LEd2d 229, 238 (1983) (citations omitted)). However, "[a]n officer does not impermissibly expand

the scope of a traffic stop by asking the driver questions, even if the subject of the questioning is unrelated to the original purpose of the stop, as long as the questioning does not unduly extend the duration of the initial, valid seizure." State v. Akuba, 2004 SD 94, ¶ 20, 686 NW2d 406, 415 (citing United States v. Ramos, 42 F3d 1160, 1165 (8thCir 1994) (Beam, J., concurring)); United States v. Shabazz, 993 F2d 431, 437 (5thCir 1993). Further, "a reasonable investigation of a traffic stop may include" questioning on "subjects like place of origination, destination, employment and the purpose of the trip." *Akuba*, 2004 SD 94, ¶ 20, 686 NW2d at 415 (citing *Ramos*, 42 F3d at 1161). An "officer's request to examine a driver's license and vehicle registration or rental papers during a traffic stop and to run a computer check on both . . . are [also] within the scope of investigation attendant to the traffic stop." United States v. Brigham, 382 F3d 500, 508 (5thCir 2004) (citations omitted). These questions "may efficiently determine whether a traffic violation has taken place, and if so, whether a citation or warning should be issued or an arrest made." *Id*. For the same reasons, "an officer may undertake similar questioning of other vehicle occupants to verify information provided by the driver." United States v. Foley, 206 F3d 802, 805 (8thCir 2000) (citation omitted). "If complications arise during these routine tasks, the vehicle may reasonably be detained 'for a longer duration than when a stop is strictly routine.'" United States v. Peralez, 526 F3d 1115, 1119 (8thCir 2008) (citing United States v. Olivera-Mendez, 484 F3d 505, 510 (8thCir 2007)).

[¶13.] In this case, most of the detention involved these types of permitted routine traffic stop questions and those necessary to follow up on the inconsistencies

that developed during the stop. Koltz's initial questioning only involved: the reason for the erratic driving; routine questions concerning both occupant's identification, place of origination, destination and purpose of their trip; and, validation of the vehicle identification number and rental papers. These routine traffic stop questions led to conflicting stories regarding the Littlebraves' destination and purpose of travel, which permitted Koltz to extend the detention to ask the follow-up questions clarifying the inconsistencies. *See Peralez*, 526 F3d at 1119 (noting that if complications arise during routine tasks, the vehicle may be detained for a longer duration (citing *Olivera-Mendez*, 484 F3d at 511)); United States v. Suitt, 569 F3d 867, 872 (8thCir 2009) (indicating that incomplete, evasive, and hesitant answers justify further interrogation during the traffic stop).

[¶14.] Therefore, the questioning consuming the first sixteen minutes of the stop did not unconstitutionally prolong the detention "beyond the time reasonably required to complete" its purpose. *Caballes*, 543 US at 407, 125 SCt at 837. Rather, that questioning represented "a 'graduate[d] . . . respons[e] to the demands of [the] particular situation.'" United States v. Sharpe*,* 470 US 675, 688, 105 SCt 1568, 1575, 84 LEd2d 605 (1985) (citing United States v. Place, 462 US 696, 709 n10, 103 SCt 2637, 2646 n10, 77 LEd2d 110 (1983)).[2]

---

2. We acknowledge that during this time, Koltz did not call in the driver's license checks and was not actively completing issuance of the warning ticket. Koltz was not, however, required to perform those tasks before completing the questioning that was either part of the traffic stop or part of the questioning necessary to resolve the inconsistent stories:

> Computerized license and registration checks are an efficient
> means to investigate the status of a driver and his auto, but they
> (continued . . .)

[¶15.]     The remaining few minutes of the detention relating to drug interdiction, although unrelated to the traffic stop, *see Peralez*, 526 F3d at 1120, were also constitutionally permissible.  We observe that the remaining four minutes before Littlebrave's admission of possession of drugs involved both Koltz's last question on the travel inconsistencies and three brief questions concerning drugs.  Other courts have found no unreasonable detention "simply by asking three brief questions related to possible drug trafficking amidst [the officer's] other traffic-related inquiries and tasks."  *See Olivera-Mendez*, 484 F3d at 511.

[¶16.]     Additionally, after the Littlebraves' inconsistent stories regarding their travel, reasonable suspicion justified an investigatory detention regarding illegal drugs.  As we have previously noted, an investigatory detention "should 'last no longer than is necessary to effectuate the purpose of the stop,' *unless* the officer has reasonable suspicion that additional criminal activity is afoot."  State v. Kenyon, 2002 SD 111, ¶ 16, 651 NW2d 269, 274 (citing *Ballard*, 2000 SD 134, ¶¶ 11-12, 617 NW2d at 841) (quoting *Royer,* 460 US at 500, 103 SCt at 1325-26).  *See also Peralez*, 526 F3d at 1120 (recognizing that "if the officer develops reasonable

_____

(. . . continued)

> need not be pursued to the exclusion of, or in particular sequence with, other efficient means.  Some lines of police questioning before the initiation of a computer check are often reasonable, as they may enable swift resolution of the stop.

*Brigham*, 382 F3d at 511.  We caution, however, that an officer may not delay computer checks for the sole purpose of prolonging the detention so as to justify additional questioning.  *See Shabazz*, 993 F2d at 436 (noting *Terry's* second prong is concerned with detentions, not questioning, but "[t]his is not to say that questioning is unrelated to the determination that a detention has exceeded its lawful duration").

suspicion that other criminal activity is afoot, the officer may expand the scope of the encounter to address that suspicion"); United States v. Lopez-Moreno, 420 F3d 420, 431 (5thCir 2005) (concluding: "[I]f additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed."); United States v. Barahona, 990 F2d 412, 416 (8thCir 1993) (concluding: "[A]n officer's questions must relate to the purpose of the stop. However, if the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions." (citing *Terry,* 392 US at 20, 88 SCt at 1879)).  In this case, "further reasonable suspicion, supported by articulable facts, emerg[ed]" making the duration of this stop reasonable. *See Brigham*, 382 F3d at 507.

[¶17.]        *Brigham*, an en banc decision, considered a factual situation remarkably similar to the case we consider today.  In *Brigham*, the driver and three occupants were stopped for following too closely.  The officer asked the driver to step out of the car and provide his license and insurance papers.  The driver complied and produced a car rental agreement listing a 50 year-old female as the only authorized driver on the rental agreement.  Because it did not appear a 50 year-old female was in the group, the officer became suspicious and asked the occupants a series of questions about their travel plans.  The driver's and passengers' responses were inconsistent.  The officer then returned to his car and ran computer checks on the car and the occupants.  He told the driver that if his license was "clean," they would soon be back on their way.  Although the checks revealed nothing of

substance, the officer remained suspicious because of the driver's and occupants' inconsistent descriptions of their travel plans. The officer then explained to the driver that one of his responsibilities was to intercept illegal contraband and narcotics. The driver denied that any illegal items were in the car and consented to a request for a search. After this investigatory detention lasting approximately thirty minutes, the officer discovered liquid codeine in the trunk. The Fifth Circuit concluded that the extended detention was justified by the emerging facts developed during the traffic stop.

> [W]e do not presume to prescribe in the abstract the scope of questioning, investigative techniques, or the length of permissible detention that may be undertaken following a valid traffic stop. The bounds of existing caselaw are clear, if fact-intensive: a traffic detention may last as long as is reasonably necessary to effectuate the purpose of the stop, *including the resolution of reasonable suspicion, supported by articulable facts within the officer's professional judgment, that emerges during the stop.*

*Id.* at 512 (emphasis added).

[¶18.]     Like *Brigham*, there were developing articulable facts in this case creating reasonable suspicion to extend Koltz's traffic stop for the brief period necessary to ask three drug-related questions. "[R]easonable suspicion to justify extending the scope of a traffic stop is examined under an objective test." *Ballard*, 2000 SD 134, ¶ 13, 617 NW2d at 841 (citations omitted). "It is our duty to make our own legal assessment of the evidence to decide under the Fourth Amendment whether the officer's actions were 'objectively reasonable.'" State v. Chavez, 2003 SD 93, ¶ 49, 668 NW2d 89, 103 (Konenkamp, J., concurring) (citing Maryland v. Buie, 494 US 325, 330, 110 SCt 1093, 1096, 108 LEd2d 276 (1990)). "Consequently,

we are not constrained by the trial judge's legal rationale for upholding the search. Equally important, we are not bound by a police officer's subjective rationale." *Id.* (citing Arkansas v. Sullivan, 532 US 769, 771-72, 121 SCt 1876, 1878, 149 LEd2d 994 (2001)).

[¶19.]     Harvey and Mary's suspicious vehicle and emerging inconsistent stories about the details of their trip established reasonable suspicion to justify the brief detention necessary to ask the three questions regarding illegal drugs.  Koltz testified that the basis for his suspicion included:  Washington State was considered a drug-source state and New York was considered a drug destination state; those who carry drugs try to mask the odor with agents such as soap or chemicals;[3] the vehicle appeared "lived-in" and had duffle bags in the back; the two parents provided inconsistent stories as to the purpose and duration of their trip; and, the children had been traveling for an extremely long period of time, yet they were "destined to be flown back to Washington at a time" that neither parent could match up.[4]  As Koltz testified, all of these factors "seemed to make the

---

3.     *See* United States v. Villa-Chaparro, 115 F3d 797, 802 (10thCir 1997) (noting that odor of detergent or air freshener "coupled with other indicia of criminal activity supports a reasonabl[y] brief inquiry" (citation omitted)).

4.     The Littlebraves were stopped on Sunday evening March 2, 2008, and would have arrived in New York no earlier than Monday evening, March 3, 2008. According to Harvey, they planned to return to Washington on Wednesday March 5, 2008, only one day after arriving in New York.  *See* United States v. Sokolow, 490 US 1, 9-10, 109 SCt 1581, 1586-87, 104 LEd2d 1 (1989) (citing unusual travel itinerary as one of several factors supporting reasonable suspicion); United States v. Wood, 106 F3d 942, 946-47 (10thCir 1997) (concluding: "It is true that unusual travel plans may provide an indicia of reasonable suspicion.").

reasonableness for this trip unreasonable." This conclusion was particularly justified by the Littlebraves' inconsistent stories concerning the purpose and length of their trip. United States v. Mendez, 118 F3d 1426, 1431 (10thCir 1997) ("[C]ontradictory or implausible travel plans can contribute to a reasonable suspicion of illegal activity."). We finally observe that Littlebraves were extremely nervous and were driving a rental car on a one-way trip only to purchase five one-way plane tickets to return after only one day. See United States v. Karam, 496 F3d 1157, 1165 (10thCir 2007) (noting that to purchase "'a series of one-way plane tickets and one-way car rentals' was 'financial[ly] illogic[al]' and 'defied common sense' and therefore was a factor contributing to reasonable suspicion" (quoting United States v. Bradford, 423 F3d 1149, 1157-58 (10thCir 2005))).

[¶20.]     Ultimately, Koltz was not acting on a mere hunch, but upon articulable facts creating reasonable suspicion developed during a routine traffic stop. See Brigham, 382 F3d at 509. Under the totality of the circumstances, the articulable facts presented here are those commonly found to create the reasonable suspicion necessary to justify a brief detention to ask limited questions regarding drug trafficking. Consequently, Koltz did not unconstitutionally prolong the investigatory detention leading to Harvey's admission that he possessed drugs in the vehicle.[5] Once Harvey admitted to possessing drugs in the vehicle, there was probable cause for the canine sniff and search of the automobile.

---

5.     Littlebrave relies upon People v. Baldwin, 388 IllApp3d 1028, 904 NE2d 1193 (IllAppCt 2009), in which an Illinois Court of Appeals concluded that the officer unreasonably prolonged the driver's detention after the initial traffic stop. In Baldwin, however, the officer "became suspicious based [only] on

(continued . . .)

#25173

[¶21.]     GILBERTSON, Chief Justice, and KONENKAMP, MEIERHENRY, and SEVERSON, Justices, concur.

_____

(. . . continued)

nervousness, heavy breathing, and the location of the defendant's right hand." *Id*. at 1034, 904 NE2d at 1199.  That search was suppressed only because these three "observations essentially amount[ed] to nothing more than hunch based on the 17 year-old passenger's nervousness." *Id*. at 1035, 904 NE2d at 1200.  Littlebrave's case involved much more than a 17 year-old's nervousness.