#28288-r-SRJ
**2018 S.D. 29**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA, Plaintiff and Appellant,

v.

BREE BARRY, Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE SUSAN M. SABERS
Judge

* * * *

MARTY J. JACKLEY
Attorney General

PAUL S. SWEDLUND
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
                                        and appellant.


BEAU J. BLOUIN of
Office of the Minnehaha
    County Public Defender
Sioux Falls, South Dakota               Attorneys for defendant
                                        and appellee.

* * * *

ARGUED ON
FEBRUARY 13, 2018
OPINION FILED **03/21/18**

#28288

JENSEN, Justice

[¶1.]     Bree Barry was indicted on four felony drug charges after marijuana and other controlled substances were found in the vehicle she was driving. Barry moved to suppress this evidence, claiming it was the product of an unlawful search after the initial traffic stop of her vehicle was improperly extended to allow time for a drug dog to arrive and complete an exterior sniff of her vehicle. The circuit court granted Barry's motion to suppress. The State filed a petition for an intermediate appeal. We reverse and remand.

## Background

[¶2.]     At approximately 9:26 a.m. on December 2, 2016, Highway Patrol Trooper Joshua Olson (Trooper Olson) observed a black Hyundai SUV driving nine miles over the speed limit, heading east on I-90 near Sioux Falls. Trooper Olson stopped the vehicle and noticed it was licensed in Colorado. He approached the vehicle and spoke with the driver, Barry. Trooper Olson asked Barry where she was coming from and inquired about her speed. Barry responded she was coming from Denver and acknowledged she had been speeding. Trooper Olson asked for Barry's driver's license. According to Trooper Olson, Barry's hand was shaking when she handed over the license.

[¶3.]     Trooper Olson asked Barry to take a seat in the front of his patrol vehicle while he processed a speeding citation. A patrol vehicle camera captured video and audio of the conversation between Trooper Olson and Barry. Barry initially explained that she was on her way home to Wisconsin after visiting Colorado. She expounded that she had flown to Colorado to stay with her brother

for ten days while he participated in an FDA clinical trial of an experimental Alzheimer's drug. The registration for Barry's vehicle showed that it belonged to a Colorado car-rental agency. The vehicle was rented in the name of a person other than Barry. Barry explained that her brother's girlfriend rented the car because Barry did not have a credit or debit card. Trooper Olson informed Barry that he was going to reduce her citation to a violation for going five miles over the speed limit. Throughout the initial encounter, Trooper Olson claimed to have observed additional unusual signs of nervousness in Barry.

[¶4.]     Approximately six minutes after the stop, Trooper Olson testified he began running Barry's driver's license and criminal history. As he did so, he asked Barry if she "had issues" with the law before. Barry stated she was a recovering heroin addict. She further indicated that she had worked off drug charges in Wisconsin a few years earlier by acting as a confidential informant. Barry stated she was now working and was in college, majoring in criminal justice and psychology. Trooper Olson then began to question Barry about whether she was transporting drugs in her vehicle, and the following conversation ensued:

| Olson: | What all are you transporting in the vehicle today? |
| --- | --- |
| Barry: | Just my suitcase, duffle bag, shoes. |
| Olson: | So they give you leave at work for something like that? |
| Barry: | Ya, um, I actually had two weeks of vacation saved up, because I got hired on at Sargento, so right off the bat after your first year you get one week, after your second year you get two weeks. But then you have to finish them out before January. It was kind of perfect timing. |
| Olson: | Anything in the vehicle I need to be concerned about, such as weapons? |

| | |
|---|---|
| Barry: | Oh, no, I'm a lover not a fighter. |
| Olson: | Transporting anything crazy like we talked about, any cocaine in the vehicle? |
| Barry: | Oh, no. |
| Olson: | Heroin? |
| Barry: | No. |
| Olson: | Methamphetamine? |
| Barry: | No. |
| Olson: | How about marijuana, hash, [inaudible]? |
| Barry: | No. |
| Olson: | I don't know if you know in this state we utilize drug safety canines, if we were going to have one do an exterior sniff of your vehicle [inaudible] |
| Barry: | (shaking her head no) No, that's alright. [inaudible]. |
| Olson: | You're extremely nervous and it appears like you're not being a hundred percent honest with me. |
| Barry: | I'm not nervous. |
| Olson: | Is there some, do you got, did you bring a little? |
| Barry: | I don't have anything.  I have nothing. |
| Olson: | Is everything in the vehicle yours? |
| Barry: | Yes. |
| Olson: | So if I were to search the vehicle today would I find anything in there? |
| Barry: | You would not find anything at all.  I promise. |
| Olson: | So it's ok if we search the vehicle today? |
| Barry: | No. |
| Olson: | K. |
| Barry: | But that's . . . because you. . . |
| Olson: | What? |
| Barry: | Only cuz I know my rights now because of school and I just [inaudible]. |
| Olson: | Right.  I'm not . . . if you . . . if you have a small amount of marijuana or paraphernalia . . . |
| Barry: | I really don't.  I really don't.  I'm literally just trying to get home. |

| Olson: | Ok.  But you said it would be ok if we did an exterior sniff with our canine? |
| Barry: | No?  Did I? |
| Olson: | Well yeah you did.  You said that'd be fine. |
| Barry: | Oh, I'm sorry. |
| Olson: | You said that'd be fine. |
| Barry: | Oh I thought that you said that if you were to do it, like, it would be fine there wouldn't be anything, that's what I thought you meant. |

[¶5.] Trooper Olson then asked, "What would you say if I told you that I had information that you were transporting drugs?"  Barry responded "That would be a lie.  How would that be possible if you don't mind me asking?"  Trooper Olson responded, "I'm just asking a hypothetical."  He then initiated eye nystagmus testing on Barry and asked Barry if she had used marijuana in Colorado.  Barry replied, "Yes.  Absolutely.  You don't get to do that anywhere else."  Trooper Olson followed up by asking if Barry had used marijuana that morning, which she denied.  Trooper Olson then radioed for a canine unit to conduct an exterior sniff of Barry's vehicle.  He asked Barry if she was wearing the same clothes when she used marijuana.  Barry began smelling her clothing and responded, "Do I smell like it?"  Trooper Olson stated, "Yeah."  He then asked Barry to perform a partial-alphabet sobriety test.  Trooper Olson told Barry he was detecting a faint smell of marijuana and asked Barry to be honest with him about whether she had brought drugs back with her from Colorado.  Barry responded that she "enjoyed [her] time in Colorado" but that she did not bring drugs back with her.

[¶6.] Trooper Olson was advised that a canine unit was en route and that Barry would need to wait for the unit to arrive.  Barry asked if the canine search

would take long, and Trooper Olson said that it would not. The canine unit arrived and commenced an exterior sniff of the vehicle. The dog indicated to Barry's vehicle during the exterior sniff. Trooper Olson then conducted a probable cause search of Barry's vehicle, which revealed a large locked graphite suitcase. Barry told the canine officer that the suitcase contained souvenirs and claimed she did not have a key to open it. Trooper Olson forced the suitcase open enough to see what appeared to be marijuana wrapped in plastic. Barry was then arrested and transported to the Minnehaha County jail.

[¶7.] Following a hearing on Barry's motion to suppress, the circuit court granted the motion and entered findings of fact and conclusions of law. The circuit court determined, among other things, that: 1) Trooper Olson had reasonable suspicion for the traffic stop but had unlawfully prolonged the stop; 2) Trooper Olson lacked a particularized and objective basis for suspecting other criminal behavior under the totality of the circumstances; 3) Trooper Olson did not smell the odor of burnt marijuana on Barry until after he had already unlawfully extended the duration of the initial stop; 4) Barry did not admit to using marijuana two days prior to the stop until after the stop was unlawfully extended; and 5) Trooper Olson unlawfully extended the stop to question Barry, conduct standard field sobriety tests, and call for a drug dog.

[¶8.] The sole question raised by the State in this intermediate appeal is whether the circuit court erred in suppressing the evidence on the grounds that Trooper Olson had unlawfully prolonged the traffic stop without reasonable suspicion of drug activity.

## Standard of Review

[¶9.]      We review a circuit court's grant of a motion to suppress based upon an alleged violation of a constitutional right de novo.  *State v. Kenyon,* 2002 S.D. 111, ¶ 12, 651 N.W.2d 269, 273.  The circuit court's findings of fact are reviewed for clear error.  *Id.*  Once the facts have been correctly ascertained, we review the circuit court's application of those facts to a legal standard de novo.  *State v. Babcock*, 2006 S.D. 59, ¶ 12, 718 N.W.2d 624, 628.  As such, determinations of reasonable suspicion are also reviewed de novo on appeal.  *State v. Ballard*, 2000 S.D. 134, ¶ 9, 617 N.W.2d 837, 840.

## Analysis

[¶10.]      The State claims that the circuit court erred in suppressing the evidence by: 1) failing to account for all the indicia of drug activity that was known or revealed to Trooper Olson during the stop; 2) finding that the stop had been unreasonably prolonged; 3) finding that Trooper Olson lacked reasonable suspicion to prolong the stop; and 4) analyzing the stop subjectively, from the perspectives of the court and Barry, rather than objectively, from the perspective of a reasonable officer.  The State argues that Trooper Olson recognized several indicators of suspected drug activity within the first few minutes of the traffic stop, providing him with reasonable suspicion to extend the traffic stop.

[¶11.]      The State cites a number of state and federal cases to support its claim that reasonable suspicion existed to extend the stop of Barry's vehicle.  For example, in *State v. Littlebrave*, 2009 S.D. 104, ¶¶ 19-20, 776 N.W.2d 85, 92-93, this Court found the following articulable facts were sufficient to create a reasonable

suspicion: 1) one-way air travel to a source state and return to a drug destination state; 2) the smell of cleaner that the officer believed to be a drug-masking agent; 3) the "lived-in" appearance of a vehicle; 4) the defendants' inconsistent stories as to their travel plans; 5) nervous behavior; and 6) driving a rental car one way with one-way return plane tickets purchased after only one day.  *Id.*

[¶12.]        The State also cites *United States v. Walton*, 827 F.3d 682, 687-88 (7th Cir. 2016), where the Seventh Circuit Court of Appeals found that one-way air travel to Colorado, return travel in a rented SUV, persistent nervousness, inconsistent stories from a driver and a passenger, and the driver's criminal history for drug trafficking offenses were sufficient to warrant prolonging a traffic stop past the 22 minutes it took an officer to write a ticket.  Finally, the State cites *United States v. Sanford*, 806 F.3d 954, 959 (7th Cir. 2015), where the same court found reasonable suspicion of drug activity where the defendant traveled through a known drug corridor, was nervous, was driving a vehicle rented by a third party, and had a history of drug offenses.  The State maintains these cases support the determination that Trooper Olson had reasonable suspicion to inquire about Barry's possible drug involvement and extend the stop to investigate his concerns.

[¶13.]        Barry argues this case is controlled by *Rodriguez v. United States*, 135 S. Ct. 1609, 1612, 191 L. Ed. 2d 492 (2015).  *Rodriguez* considered "whether the Fourth Amendment tolerates a dog sniff conducted after completion of a traffic stop."  *Id*.  The *Rodriguez* Court stated, "A seizure justified only by a police-observed traffic violation, therefore, 'becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission' of issuing a ticket for the violation."

*Id.* (quoting *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S. Ct. 834, 834, 160 L. Ed. 2d 842 (2005)). In *Rodriguez*, an officer stopped the defendant after seeing the defendant slowly veer onto the shoulder of the road and "then jerk back onto the road." *Id.* The officer issued a warning approximately 20 minutes later. *Id.* at 1613. The officer then detained the defendant for another seven to eight minutes to allow for the arrival of a second officer so the original officer could safely complete an exterior canine sniff of the vehicle. *Id.* at 1615-16. The *Rodriguez* Court determined the additional detention was illegal absent reasonable suspicion, but did not review the question whether there *was* reasonable suspicion to extend the stop. *Id.* at 1616-17. The Court remanded that issue to the Eighth Circuit Court of Appeals. *Id.*

[¶14.]     *Rodriguez* is controlling here unless Trooper Olson had reasonable suspicion of drug activity to justify extending the stop of Barry. This Court has echoed *Rodriguez*, noting that an investigatory detention "should 'last no longer than is necessary to effectuate the purpose of the stop,' unless the officer has reasonable suspicion that additional criminal activity is afoot." *Littlebrave*, 2009 S.D. 104, ¶ 16, 776 N.W.2d at 91 (emphasis omitted) (quoting *Kenyon*, 2002 S.D. 111, ¶ 16, 651 N.W.2d at 274). *See also Rodriguez*, 135 S. Ct. at 1614. "Like reasonable suspicion for the initial stop, reasonable suspicion to justify extending the scope of a traffic stop is examined under an objective test." *Ballard*, 2000 S.D. 134, ¶ 13, 617 N.W.2d at 841. "In making a reasonable suspicion determination, we must look at the '*totality of the circumstances*' of each case to see whether the detaining officer has a '*particularized and objective basis*' for

suspecting legal wrongdoing." *State v. Herren*, 2010 S.D. 101, ¶ 8, 792 N.W.2d 551, 554 (quoting *State v. Bergee*, 2008 S.D. 67, ¶ 10, 753 N.W.2d 911, 914). "The officer's observations and experience, the location, and the underlying circumstances need only reasonably support 'a commonsense inference' that additional criminal activity is occurring or about to occur." *Kenyon*, 2002 S.D. 111, ¶ 18, 651 N.W.2d at 274 (quoting U*nited States v. Arvizu*, 534 U.S. 266, 277, 122 S. Ct. 744, 752, 151 L. Ed. 2d 740 (2002)).

[¶15.] "[T]he investigative methods employed [by an officer] should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Littlebrave*, 2009 S.D. 104, ¶ 12, 776 N.W.2d at 89. "However, 'an officer does not impermissibly expand the scope of a traffic stop by asking the driver questions, even if the subject of the questioning is unrelated to the original purpose of the stop, as long as the questioning does not *unduly extend* the duration of the initial, valid seizure.'" *Id.* (emphasis added) (quoting *State v. Akuba*, 2004 S.D. 94, ¶ 20, 686 N.W.2d 406, 415). "'[A] reasonable investigation of a traffic stop may include' questioning on 'subjects like place of origination, destination, employment[,] and the purpose of the trip.'" *Id.* (quoting *Akuba*, 2004 S.D. 94, ¶ 20, 686 N.W.2d at 415). "If complications arise during these routine tasks, the vehicle may reasonably be detained 'for a longer duration than when a stop is strictly routine.'" *Id.* at 90 (quoting *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008)).

[¶16.] The parties do not dispute Trooper Olson had a legal basis to stop Barry for speeding. Within six minutes after the stop, and while still conducting his

investigation incidental to the traffic stop, Trooper Olson became aware of a number of unusual circumstances concerning Barry's flight to Colorado and return in a rental car leased by a third party. He also became aware of her history of drug addiction and prior criminal drug involvement. Trooper Olson also testified that Barry displayed unusual nervousness throughout the stop even after he informed her that he would reduce the speeding citation. At the time of the stop, Trooper Olson had fifteen years of experience on the South Dakota Highway Patrol and specialized training in narcotics and drug interdiction. Trooper Olson recognized Colorado as a drug-source state and testified that based on his training and experience, he knew it was common for drug dealers to pay someone to "come to Denver . . . set them up with a vehicle, and have them drive back wherever their destination is."

[¶17.] In *Littlebrave,* we held that a "suspicious vehicle and emerging inconsistent stories about the details of their trip established reasonable suspicion to justify the brief detention necessary to ask the three questions regarding illegal drugs." 2009 S.D. 104, ¶ 19, 776 N.W.2d at 92. The information available to Trooper Olson—while still within the initial lawful scope of the reason for his stop— likewise created reasonable suspicion to inquire further about possible drug activity. This information included that: Barry was unusually nervous; Barry was returning from a drug-source state where she did not live; Barry was driving a rental car rented by an unknown third party; Barry gave no explanation why she flew to Colorado and rented a car to return home; Barry stated she was a recovering heroin addict; and Barry admitted prior criminal drug activity and that she had

been a confidential informant. Barry had plausible explanations for some of her circumstances, but Trooper Olson was unable to confirm the veracity of these explanations.[1] Aside from nervousness, the circuit court failed to consider or address any of these other indicators in concluding that Trooper Olson lacked reasonable suspicion of drug activity.

[¶18.] The circuit court concluded that by this time, Trooper Olson had effectuated the purpose of the traffic stop and improperly extended the stop by questioning Barry about illegal drugs without reasonable suspicion. The circuit court's determination that Trooper Olson had completed his purpose for the stop at this point is not supported by the record. The record is undisputed that Trooper Olson was still conducting the license check and had not yet written Barry's ticket at this point in the stop. More importantly, Trooper Olson had reasonable suspicion to extend the stop based upon the information he learned within the first six minutes of the stop.

---

1.     A number of decisions from the Eighth Circuit Court of Appeals have also found reasonable suspicion under similar circumstances to support extending the stop to allow for the arrival of a drug dog. *United States v. Riley,* 684 F.3d 758, 761 (8th Cir. 2012) (holding unusual nervousness, inability to explain inconsistencies about defendant's itinerary, and a prior history of drug convictions provided reasonable suspicion to delay the stop to call for a drug dog); *United States v. Lyons*, 486 F.3d 367, 372 (8th Cir. 2007) (finding contradictory descriptions of the planned itinerary between the driver and passenger, a plan to rent two different vehicles during the course of the trip, and a large amount of luggage for a short trip provided law enforcement with reasonable suspicion to prolong a stop for the arrival of a drug dog); *United States v. Fuse,* 391 F.3d 924, 929 (8th Cir. 2004) (stating an officer had reasonable suspicion to conduct a dog sniff where the defendant was driving from a drug-source state in a vehicle belonging to another person, defendant was extremely nervous, had an unusual explanation for his trip, and had a prior criminal history).

[¶19.]     As noted by the circuit court, Trooper Olson's attention began to turn toward his concern that Barry was involved in drug activity at this point.[2] Trooper Olson's questions about Barry's drug involvement were more extensive than in *Littlebrave*, continuing for approximately six minutes.  However, all of Trooper Olson's questions and actions during this time were directly related to his reasonable suspicion that Barry might be transporting illegal drugs.  His questions about whether Barry was transporting illegal drugs and his request for a consent search of the vehicle were the least intrusive means available to dispel those concerns.  Significantly, Trooper Olson did not even call for a drug dog until Barry admitted that she had used marijuana in Colorado two days earlier.

[¶20.]     In its oral ruling, the circuit court determined that Trooper Olson had improperly extended the stop by the time Barry admitted using marijuana in Colorado and stated that "given [Barry's] admission as to legal use in the State of Colorado which permits the smoking of marijuana, I can't even find that on these facts that rises to the level of suspected criminal activity."  Barry also asserts that her legal use of marijuana in Colorado should not have been considered by Trooper Olson as part of his reasonable suspicion.  On the contrary, the operative analysis for reasonable suspicion is not the legality of Barry's use of marijuana in Colorado, but whether this fact, along with other indicia, objectively supported Trooper

---

2.     Trooper Olson never issued a citation to Barry for speeding.  The record does not clearly show how much longer the issuance of such a citation may have taken if Trooper Olson had not begun his investigation into suspected drug activity.

Olson's reasonable suspicion to believe that Barry was in possession of illegal drugs in South Dakota.

[¶21.] Shortly after Barry admitted using marijuana in Colorado, Trooper Olson indicated he smelled a faint odor of marijuana coming from Barry's clothes. Barry smelled her clothes and did not deny that they smelled of marijuana. Trooper Olson testified that he smelled the odor of marijuana before he called for the drug dog. However, the circuit court found that Trooper Olson stated he was getting "faint whiffs" of marijuana approximately 14 minutes after stopping Barry. We cannot say this finding was clear error based upon the video evidence and Trooper Olson's uncertainty about the exact time he began smelling the marijuana. However, Trooper Olson had already developed reasonable suspicion of Barry's drug involvement several minutes before he detected the odor of marijuana on her clothing. Detecting the odor of marijuana only heightened these concerns.

[¶22.] Barry attempts to separately parse out each of the indicators that Trooper Olson became aware of during the stop. Admittedly, each fact standing alone was insufficient to warrant reasonable suspicion to believe Barry might be transporting illegal drugs. However, as the United States Supreme Court recently noted in an action filed under 42 U.S.C. § 1983 claiming that law enforcement did not have probable cause for a search of a residence, the "'totality of the circumstances' requires courts to consider 'the whole picture.'" *District of Columbia v. Wesby*, ___ U.S. ___, ___, 138 S. Ct. 577, 588, ___ L. Ed. 2d ___ (2018) (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 695, 66 L. Ed. 2d 621

(1981)). "Our precedents recognize that the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation." *Id.*

[¶23.] Considering the whole picture, Trooper Olson developed reasonable suspicion to believe that Barry was involved in drug activity within minutes after the stop. His additional questioning of Barry over the next several minutes only heightened this suspicion. Contrary to the circuit court's conclusion, Trooper Olson was not relying upon a "hunch" to extend the stop. Rather, he made commonsense inferences based upon training and experience, stemming from Barry's unusual nervousness, the suspicious circumstances of her trip, and her admitted drug history. Barry's admission that she smoked marijuana two days earlier before leaving Colorado and the odor of marijuana coming from her clothing further enhanced this reasonable suspicion. The drug dog arrived within approximately 10 minutes after Trooper Olson learned this additional information, and the entire stop lasted approximately 30 minutes.[3] On this record, the length of time of the stop was not unreasonable. The actions of law enforcement were properly

---

3.   A number of courts have approved of a delay for the arrival of a drug dog once an officer develops reasonable suspicion of drug involvement during a traffic stop. *United States v. Woods,* 829 F.3d 675, 680 (8th Cir. 2016) (approving a roughly 20-minute wait for a drug dog supported by reasonable suspicion); *United States v. Sanford,* 806 F.3d 954, 959 (7th Cir. 2015) (holding a delay of eight minutes before the drug dog arrived was not unreasonable after the officer developed reasonable suspicion of drug activity during a traffic stop); *Riley,* 684 F.3d at 761 (upholding a 54-minute stop, caused by the delayed arrival of a drug dog, that was supported by reasonable suspicion); *United States v. Pettit,* 785 F.3d 1374, 1378, 1383 (10th Cir. 2015) (prolonging a traffic stop by 15 minutes to wait for a drug dog was justified because of reasonable suspicion of drug activity); *Lyons,* 486 F.3d at 372 (approving a 31-minute delay for drug dog to arrive because of reasonable suspicion that drugs were in the vehicle).

supported by reasonable suspicion up to and including the exterior sniff of the vehicle driven by Barry.

## Conclusion

[¶24.]     Trooper Olson's decision to extend the initial traffic stop to question Barry about drug activity and to conduct the drug dog sniff was supported by reasonable suspicion.  Barry's traffic stop was not unlawfully extended and the circuit court erred in suppressing evidence found during the search of the vehicle. We reverse and remand the case for trial.

[¶25.]     GILBERTSON, Chief Justice, and ZINTER, SEVERSON, and KERN, Justices, concur.