2019 IL App (1st) 181510

SIXTH DIVISION
JUNE 7, 2019

No. 1-18-1510

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 6051 |
| | ) | |
| MARK CASSINO, | ) | Honorable |
| | ) | Carl Boyd, |
| Defendant-Appellee. | ) | Judge Presiding. |

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.
Justice Harris concurred in the judgment and opinion.
Justice Connors dissented, with opinion.

**OPINION**

¶ 1    Appellant, the People of the State of Illinois (State), seeks reversal of the order of the circuit court of Cook County granting defendant-appellee Mark Cassino's motion to quash arrest and suppress evidence. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 2                          BACKGROUND

¶ 3    Defendant was driving a rental car when he was pulled over by a state trooper for speeding. During the traffic stop, the state trooper prolonged the stop while he contacted the rental car company (Hertz), who told the trooper that defendant was not an authorized driver under the vehicle's rental agreement. A Hertz employee asked the trooper to recover the vehicle for Hertz. Defendant was handcuffed and placed in the squad car. The trooper then searched the

rental vehicle and discovered narcotics. The defendant was charged with possession of a controlled substance and possession of a controlled substance with intent to deliver.

¶ 4 On June 29, 2017, defendant filed a "motion to quash arrest and suppress evidence" (the motion to suppress), asserting that his "detention, search and arrest" were without reasonable suspicion and that the search of the rental car was unlawful.

¶ 5 On August 9, 2017, the trial court conducted a hearing on the motion to suppress. The defense called a single witness, Trooper Garet Lindroth of the Illinois State Police. Trooper Lindroth testified that on the afternoon of defendant's arrest, he was stationed in his police vehicle "working a speed-enforcement detail."

¶ 6 At approximately 1:38 p.m., a Ford vehicle passed him, traveling at a speed of 89 miles per hour in a 55-mile-per-hour zone. Trooper Lindroth pursued the vehicle and initiated a traffic stop. At approximately 1:40 p.m., he approached the stopped vehicle, which was driven by defendant. He informed defendant that he had been stopped for speeding. Trooper Lindroth asked defendant "for his driver's license and his rental agreement." Trooper Lindroth testified that, when he approached the vehicle, he "had already [run] the registration," which indicated that it was a Hertz rental car.

¶ 7 Defendant provided the trooper with his driver's license and the rental agreement. At that time, he "indicated [to Trooper Lindroth] that he was not on the rental agreement."[1] Trooper Lindroth did not ask defendant any questions about the rental agreement or how he came to possess the rental car. Instead, Trooper Lindroth "went back to [his] squad car and contacted Hertz about any third-party drivers." He did so although there was no "general order" of the

_____

[1]There is nothing in the record identifying who was named as the lessee on the Hertz rental agreement. Nor is there anything indicating whether the named lessee gave defendant permission to drive the rental car.

Illinois State Police directing officers to contact a rental company under such circumstances. Additionally, he testified that he did not suspect that the car was stolen.

¶ 8    Before he contacted Hertz, Trooper Lindroth used a computer to check defendant's driver's license and confirmed that the license was valid. Trooper Lindroth stated that this check was completed in "under a minute."

¶ 9    Trooper Lindroth testified that it took "a few minutes" for him to contact Hertz. He called the company and "was connected to their emergency police side of Hertz, and provided them with information they were asking of the vehicle, and they informed me whether or not *** they wanted me to recover the vehicle for them." According to Trooper Lindroth, "Hertz indicated that [defendant] was not an authorized driver [on the rental agreement], and that they wanted the vehicle impounded." Trooper Lindroth acknowledged that he did not attempt to contact the person listed as the lessee on the rental agreement. Trooper Lindroth did not ask defendant any questions regarding the person listed on the rental agreement or how defendant came to be driving the vehicle.

¶ 10    After speaking with Hertz, Trooper Lindroth returned to the rental car. According to his arrest report, he returned to the vehicle at 2:05 p.m. He agreed that this was "roughly" 25 minutes after he initially stopped the vehicle. At that time, Trooper Lindroth "informed [defendant] that Hertz wanted their car back/recovered" and that defendant "was not registered as the permitted driver, nor was he an authorized additional driver." He told defendant that he would be charged with criminal trespass to the rental vehicle. Defendant was then handcuffed and placed in the back of the squad car.

¶ 11    Trooper Lindroth stated that he proceeded to "perform an inventory search" of the vehicle because he planned to have the rental car towed. Trooper Lindroth acknowledged that he never asked defendant for permission to search the vehicle and that he had no search warrant.

¶ 12    When he searched the vehicle, Trooper Lindroth opened the "center console" between the two front seats. Inside, he found a tied black plastic bag that "contained another clear-plastic bag" containing "packed round balls" of suspected narcotics. Trooper Lindroth placed defendant under arrest for possession of a controlled substance. It does not appear from the record that the trooper ever issued a speeding ticket to defendant, which was the original reason for the stop.

¶ 13    Trooper Lindroth testified on cross-examination that defendant had a valid Nevada driver's license. Trooper Lindroth also stated that defendant promptly acknowledged that his name was not on the rental agreement "[b]efore he even gave [the agreement] to [Trooper Lindroth]."

¶ 14    Trooper Lindroth agreed that he called Hertz to verify that defendant was not authorized to drive the vehicle. Trooper Lindroth testified that a Hertz representative confirmed that defendant was not authorized to drive the car, and told him that Hertz "wanted [Trooper Lindroth] to seize that car and take legal custody of that car."

¶ 15    Also on cross-examination, Trooper Lindroth was asked, "if, in fact, that had been [defendant's] car and you would have stopped him for a traffic violation, you would have just g[iven] him the ticket, and he would have been free to go?" He agreed that he detained defendant "because he did not own that vehicle, he wasn't authorized to drive that vehicle." However, Trooper Lindroth acknowledged that he only learned that information after calling Hertz.

¶ 16    Trooper Lindroth stated that he searched the car because it was "our policy" to "inventory" a vehicle before it is towed. Trooper Lindroth explained that the police "must know

what's in the vehicle" because "we're liable and responsible for anything that happens to any items or property inside that vehicle while it goes to the tow yard." Trooper Lindroth testified that the police tested the suspected narcotics at the scene.

¶ 17    On redirect examination, Trooper Lindroth agreed that he has previously stopped cars that were not driven by the registered owner but in such situations he has never before called the actual owner of the vehicle during a traffic stop. Trooper Lindroth agreed that he had not read the rental agreement, which defendant provided to him upon being stopped. Therefore, he did not know its guidelines for drivers other than the person who rented the vehicle. He claimed that he called Hertz for clarification regarding who was authorized to drive the rental vehicle.

¶ 18    Trooper Lindroth agreed that "without that phone call to Hertz, [he] simply would have given [defendant] a ticket, and he would have been on his way." He also agreed that he had already checked the validity of the defendant's license before he contacted Hertz and that he did not suspect that the vehicle was stolen.

¶ 19    No other witnesses were called at the hearing. After the court heard argument from defense counsel and the State, it granted defendant's motion to suppress.

¶ 20    In its ruling, the trial court identified the pertinent issue as whether "contacting Hertz *** was related in scope to the circumstance that justified the stop in the first place." The court found that Trooper Lindroth "certainly exceeded the scope of the stop when he on his own accord found it necessary to call Hertz *** when the Officer clearly stated that in a different circumstance, if this were a private owner, a private car driven by the non-owner of the car, he would not contact the owner of that automobile." The court remarked that "[t]he seizure, although it was lawful at its inception *** became unlawful because of the prolonged time in the

delay to call Hertz for [Trooper Lindroth's] own personal gratification." The trial court thus granted the defendant's motion to suppress.

¶ 21    The State filed a motion to reconsider. In that motion, the State argued that because defendant was not the renter and was unauthorized to drive the rental car, he lacked any reasonable expectation of privacy; he thus lacked "standing" to challenge the search of that vehicle. The State also argued that Trooper Lindroth's inquiry to Hertz did not unreasonably prolong the stop. The State cited the United States Supreme Court's decision in *Rodriguez v. United States*, 575 U.S. ___, 135 S. Ct. 1609 (2015), for the proposition that, during a traffic stop, a police officer may make "ordinary inquiries incident to the stop" such as checking a driver's license and vehicle registration.

¶ 22    On October 20, 2017, the court reversed its earlier ruling and granted the State's motion to reconsider. The court first observed that in raising a fourth amendment challenge to a search, it was defendant's burden to prove standing by demonstrating that he had a reasonable expectation of privacy in the place searched. The court determined that defendant lacked a reasonable expectation of privacy in the rental car for two reasons. First, the court found that defendant failed to show that his use of the car was authorized by the vehicle's owner, Hertz. Second, the court found that defendant "failed to show that he had been given permission to use the vehicle by the renter of the vehicle" as there was no evidence that the renter of the vehicle had given defendant permission to drive the car. On that basis, the court granted the State's motion to reconsider, thus reversing its earlier ruling which had suppressed the fruits of the search.

¶ 23    On November 17, 2017, defendant filed a motion to reconsider the court's ruling granting the State's motion to reconsider its initial decision on the motion to suppress. Defendant's motion noted that the trial court had granted the State's motion to reconsider on the basis of

defendant's lack of standing but its ruling had not addressed the separate issue of "the reasonableness of the length of time it took" for Trooper Lindroth to detain defendant and contact Hertz. Defendant's motion cited *Rodriguez* for the proposition that, absent reasonable suspicion, an officer may not make inquiries unrelated to the suspected traffic violation that unreasonably prolong a traffic stop. The focus of defendant's motion was that Trooper Lindroth lacked reasonable suspicion to justify detaining defendant for 25 minutes while he contacted Hertz.

¶ 24    Before the trial court heard argument on the defendant's motion to reconsider, the United States Supreme Court decided *Byrd v. United States*, 584 U.S. ___, ___, 138 S. Ct. 1518, 1531 (2018), which held that the "mere fact that a driver in lawful possession or control of a rental car is not listed on the rental agreement will not defeat his or her otherwise reasonable expectation of privacy."

¶ 25    On June 14, 2018, the trial court heard argument on defendant's motion to reconsider its ruling in the State's favor, which reversed its original ruling in defendant's favor. Defendant's counsel cited *Byrd* in support of the proposition that defendant had a reasonable expectation of privacy and, therefore, had standing. The State responded that *Byrd*'s facts were distinguishable, and that under *Byrd* it remained defendant's burden to show his "lawful possession" of the rental car to establish his standing. The State noted that, in *Byrd*, there was evidence that the lessee of the rental vehicle had given the defendant authority to use it, whereas in this case, defendant did not present such evidence.

¶ 26    In response, defense counsel pointed out that Trooper Lindroth had never asked defendant whether he had permission from the person who rented the vehicle from Hertz to use the rental car. Defense counsel also argued that the trooper's decision to call Hertz resulted in an

improper "25-minute delay" for a speeding ticket and that such delay independently supported granting defendant's motion to suppress. The trial court agreed.

¶ 27    In its ruling, the court recalled that, when it initially granted the motion to suppress, it "was troubled by the 25-minute detention [by] the police officer" and believed that the delay "exceeded the scope of the initial stop, which was basically a speeding ticket." The court said:

> "I don't believe police officers ordinarily stop a vehicle when they find out a person is not the driver and call the owner of the car to ascertain whether or not the driver is a valid person. They generally check the identification of the driver. If the license is valid and the car has not been reported stolen, which is the case here, they usually issue a speeding ticket, and the person goes on. In this case, the [United States Supreme] Court in *Byrd* states that a person does have a reasonable expectation of privacy. And I believe [defendant] shares that same reasonable expectation of privacy. And for the police to delay [defendant], call the rental company, I didn't understand it then. I didn't like it then. It didn't pass the smell test then, and it doesn't pass the smell test now."

The court thus granted defendant's motion to reconsider its ruling in favor of the State. The court thus reversed itself once more and granted the motion to suppress.

¶ 28    The State subsequently filed a "Certificate of Substantial Impairment" stating that the granting of the motion to suppress substantially impaired its ability to prosecute the case and thus it would appeal pursuant to Illinois Supreme Court Rule 604(a)(1) (eff. July 1, 2017). On July 11, 2018, the State filed a notice of appeal.

¶ 29                                    ANALYSIS

¶ 30    We first note that we have jurisdiction because the State filed a timely notice of appeal pursuant to Rule 604(a)(1), which permits the State to appeal from an order "the substantive effect of which results in *** suppressing evidence." Ill. S. Ct. R. 604(a)(1) (eff. July 1, 2017).

¶ 31    On appeal, the State asserts two lines of argument to urge that the motion to suppress should not have been granted. First, the State contends that Trooper Lindroth's inquiries during the traffic stop and corresponding 25-minute delay were reasonable. The State cites *Rodriguez* for the proposition that during a traffic stop, an officer may make ordinary inquiries related to safety concerns, such as checking the driver's license, checking if a driver has outstanding warrants, and inspecting a vehicle's registration and proof of insurance. The State argues that, just as an officer may check registration, under the circumstances of this case, "placing the call to Hertz was well within the mission of the stop." The State argues that, under *Rodriguez*, the "mission" of a traffic stop is to address the immediate traffic violation and to "attend to related safety concerns." 575 U.S. at ___, 135 S. Ct. at 1614. The State further argues that *Rodriguez* additionally supports Trooper Lindroth's prolonged detention of defendant because, "[b]eyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to" the traffic stop. (Internal quotation marks omitted.) *Id.* at ___, 135 S. Ct. at 1615. The State suggests that Trooper Lindroth's call to Hertz was one of these permissible "ordinary inquiries." The State argues that although this inquiry resulted in a delay of approximately 25 minutes, it was nonetheless objectively reasonable and within the mission of a valid traffic stop.

¶ 32    The State also makes a policy argument, suggesting that to disallow lengthy stops such as the one in this case would impede law enforcement's ability to ensure that a car is being responsibly driven. The State argues that a call by police to the vehicle's registered owner

"cannot be unreasonable where it extends the duration of the stop comparably to a warrant or license check."

¶ 33     Second, apart from the reasonableness of the detention, the State urges that defendant failed to meet his burden to establish that he had a legitimate expectation of privacy in the rental car. The State points out that defendant "did not present any evidence that the person who rented the vehicle from Hertz gave him permission to drive it."

¶ 34     The State suggests that we should be guided by *People v. Bower*, 291 Ill. App. 3d 1077, 1083 (1997), which held that a defendant lacked standing to challenge the search of a rental car where defendant asked a friend to rent the vehicle for defendant's use after the rental car company rejected defendant's application. The State argues that the trial court should have followed *Bower* and found that defendant failed to establish any legitimate expectation of privacy. The State posits that this conclusion is not affected by the United States Supreme Court's recent decision in *Byrd*. The State suggests that the circuit court erroneously interpreted *Byrd* as holding that the driver of a rental car always has a legitimate expectation of privacy, regardless of whether the driver is authorized to operate the car. The State emphasizes that, in this case, defendant offered no evidence as to whether an "authorized renter" gave him permission to drive the rental car.

¶ 35     In response, defendant argues that the facts and holding of *Rodriguez* are analogous to the facts of this case. He asserts that, although *Rodriguez* permits an officer to conduct certain checks during an otherwise lawful traffic stop, he may not do so in a way that prolongs the stop, absent *reasonable suspicion*. Defendant rejects the State's contention that the inquiry to Hertz was within the "mission of the ticket" pursuant to *Rodriguez* or that it was related to safety concerns. Specifically, defendant rejects the State's assertion that the call to Hertz was analogous

to a call to check the validity of a driver's license. Defendant acknowledges that a "license check is within the mission of the traffic stop" because it is "directly related to the scope of the traffic stop." Defendant points out that in this case, Trooper Lindroth did check defendant's license, and determined that it was valid. That process was completed in under a minute. Yet, the trooper proceeded to make the separate, lengthy inquiry to Hertz, even after ascertaining that defendant had a valid driver's license.

¶ 36    Defendant also points out Trooper Lindroth's admission that when he has previously stopped cars not driven by their registered owners, he has *never* contacted the owner during a traffic stop. Defendant urges that it would be incongruous to permit such an inquiry during a traffic stop of a rental car, but not for nonrental vehicles.

¶ 37    Defendant emphasizes that Trooper Lindroth did not testify that defendant was behaving suspiciously. Further, Trooper Lindroth testified that he did not suspect that the rental car was stolen. Defendant also notes that Trooper Lindroth did not ask him *anything* about the rental agreement, nor did the trooper read it. Instead, Trooper Lindroth "decided to insert himself into what amounts to a civil contract dispute between Hertz and the lessee." Defendant asserts that the mere fact that his name was not on the rental agreement was insufficient to justify the trooper's actions, which unreasonably extended his detention by prolonging what should have been a routine traffic stop.

¶ 38    Defendant otherwise argues that he had a legitimate expectation of privacy in the rental car, relying on *Byrd*. He notes that there is "no evidence in the record that the vehicle was ever reported stolen or that [his] presence in the car was unlawful." In response to the State's reliance on *Bower*, defendant points out that it was decided before the United States Supreme Court's decision in *Byrd*. Defendant claims that *Byrd* now makes clear "that drivers in lawful possession

or control of a rental vehicle maintain a reasonable expectation of privacy absent specific circumstances not present in this case."

¶ 39     A two-part standard of review applies when we review a trial court's ruling on a motion to quash arrest and suppress evidence. *People v. Holmes*, 2017 IL 120407, ¶ 9. "Great deference is afforded to the trial court's findings of fact, and those factual findings will be reversed only if they are against the manifest weight of the evidence." *Id.* However, we review *de novo* the "trial court's ultimate legal ruling as to whether the evidence should be suppressed." *Id.*

¶ 40     "The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures by the government. This protection extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest." (Internal quotation marks omitted.) *United States v. Rodriguez-Escalera*, 884 F.3d 661, 667 (7th Cir. 2018). Thus, "whenever a police officer decides to stop a vehicle, the stop must meet the reasonableness requirements of the Fourth Amendment." *Id.*; see also *People v. Jones*, 215 Ill. 2d 261, 270 (2005) ("a vehicle stop is subject to the fourth amendment requirement of reasonableness in all the circumstances").

¶ 41     "If a search or seizure violates the Fourth Amendment, courts will exclude evidence gained from that violation in judicial proceedings against the person injured." *Rodriguez-Escalera*, 884 F.3d at 667; see also *Terry v. Ohio*, 392 U.S. 1, 29 (1968) ("[E]vidence may not be introduced if it was discovered by means of a seizure and search which were not reasonably related in scope to the justification for their initiation.").

¶ 42     The United States Supreme Court's decision in *Terry* "established the legitimacy of an investigatory stop 'in situations where [the police] may lack probable cause for an arrest.' " *Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (quoting *Terry*, 392 U.S. at 24). "When the stop is justified by suspicion (reasonably grounded, but short of probable cause) that criminal activity is

afoot \*\*\*, the police officer must be positioned to act instantly on reasonable suspicion that the persons temporarily detained are armed and dangerous." *Id.* Thus, *Terry* held that a police officer's "limited search of outer clothing for weapons serves to protect both the officer and the public" and that such a patdown search was reasonable under the fourth amendment. *Id.* (citing *Terry*, 392 U.S. at 23-24, 27, 30-31).

¶ 43    The United States Supreme Court has observed that most traffic stops " 'resemble, in duration and atmosphere, the kind of brief detention authorized in *Terry.*' " *Id.* Our supreme court has stated that since "the usual traffic stop is more analogous to a *Terry* investigative stop than to a formal arrest," "courts generally analyze fourth amendment challenges to the reasonableness of traffic stops under *Terry* principles." *Jones*, 215 Ill. 2d at 270. Our supreme court explained:

> "Pursuant to *Terry*, a law enforcement officer may, under appropriate circumstances, briefly detain a person for questioning if the officer reasonably believes that the person has committed, or is about to commit, a crime. [Citation.] However, the investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Id.* at 270-71.

¶ 44    The United States Supreme Court has explained the scope of a reasonable roadside detention as follows:

> "A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends

when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. [Citation.] An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, *so long as those inquiries do not measurably extend the duration of the stop*."

(Emphasis added.) *Johnson*, 555 U.S. at 333.

¶ 45    Illustrating the permissible scope of a detention, in *Illinois v. Caballes*, 543 U.S. 405 (2005), the United States Supreme Court found no fourth amendment violation where the use of a narcotics-detection dog during a traffic stop *did not prolong* the traffic-related detention. In that case, a state trooper stopped respondent's vehicle for speeding and reported the stop by radio. *Id.* at 406. A second trooper heard the radio report and headed to the scene with a narcotics-detection dog. *Id.* While the first officer "was in the process of writing a warning ticket, [the second trooper] walked his dog around respondent's car." *Id.* After the dog "alerted at the trunk," the officers searched it, discovered marijuana, and arrested respondent; "[t]he entire incident lasted less than 10 minutes." *Id.* The United States Supreme Court granted *certiorari* to decide "[w]hether the Fourth Amendment requires reasonable, articulable suspicion to justify using a drug-detection dog to sniff a vehicle during a legitimate traffic stop." (Internal quotation marks omitted.) *Id.* at 407.

¶ 46    The *Caballes* Court recognized that "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.* The Court noted that the judges in prior state-court proceedings "carefully reviewed the details of [the arresting officer's] conversations with

respondent and the precise timing of his radio transmission *** to determine whether he had improperly extended the duration of the stop to enable the dog sniff to occur." *Id.* at 408. The Court "accept[ed] the state court's conclusion that the duration of the stop in this case was entirely justified by the traffic offense and the ordinary inquiries incident to such a stop." *Id.*

¶ 47    The United States Supreme Court proceeded to hold that a dog sniff during a lawful stop did not compromise a legitimate privacy interest and did not violate the fourth amendment. *Id.* at 409 ("In this case, the dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation. Any intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement.").

¶ 48    However, in the 2015 *Rodriguez* decision, the United States Supreme Court clarified that a dog sniff that *extends* the detention of an initially legitimate traffic stop—even by a matter of minutes—is unlawful if not supported by reasonable suspicion. 575 U.S. at ___, 138 S. Ct. 1609. In this appeal, the State and defendant both claim that *Rodriguez* supports their respective positions, and so we review that decision in detail.

¶ 49    In *Rodriguez*, a K-9 police officer (Officer Struble) pulled over a vehicle at 12:06 a.m. after it briefly veered onto the shoulder of a highway. *Id.* at ___, 135 S. Ct. at 1612. There were two men in the vehicle: the driver (Rodriguez) and one passenger (Pollman). *Id.* at ___, 135 S. Ct. at 1612.

¶ 50    Officer Struble first spoke to Rodriguez, who provided his license, registration, and proof of insurance. *Id.* at ___, 135 S. Ct. at 1613. Officer Struble returned to his patrol car and ran a "records check" on Rodriguez; he then returned to the vehicle and questioned Pollman. *Id.* at ___, 135 S. Ct. at 1613. Officer Struble then "returned again to his patrol car, where he

completed a records check on Pollman, and called for a second officer." *Id.* at ___, 135 S. Ct. at 1613. Struble began writing a warning ticket for Rodriguez. *Id.* at ___, 135 S. Ct. at 1613.

¶ 51    Officer Struble returned to the vehicle a third time to issue the written warning. *Id.* at ___, 135 S. Ct. at 1613. By 12:27 or 12:28 a.m., Officer Struble had "finished explaining the warning *** and had given back to Rodriguez and Pollman the documents obtained from them." *Id.* at ___, 135 S. Ct. at 1613. However, Officer Struble did not let them leave at that time but asked for permission to walk his dog around the vehicle. *Id.* at ___, 135 S. Ct. at 1613. Rodriguez "said no"; Officer Struble then instructed Rodriguez to exit the vehicle and "stand in front of the patrol car to wait for the second officer." *Id.* at ___, 135 S. Ct. at 1613.

¶ 52    After a second officer arrived, Officer Struble led his dog around the vehicle; the dog alerted to the presence of drugs. *Id.* at ___, 135 S. Ct. at 1613. "[S]even or eight minutes had elapsed from the time [Officer] Struble issued the written warning until the dog indicated the presence of drugs." *Id.* at ___, 135 S. Ct. at 1613. The officers searched the vehicle and recovered a bag of methamphetamine. *Id.* at ___, 135 S. Ct. at 1613.

¶ 53    In his subsequent prosecution, Rodriguez moved to suppress the evidence from the vehicle search, on the ground that Officer Struble prolonged the traffic stop to conduct the dog sniff, without reasonable suspicion. *Id.* at ___, 135 S. Ct. at 1613. The district court denied the motion to suppress, and the Eighth Circuit affirmed. *Id.* at ___, 135 S. Ct. at 1613-14. The United States Supreme Court granted *certiorari* to resolve "whether police routinely may extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff." *Id.* at ___, 135 S. Ct. at 1614.

¶ 54    The United States Supreme Court in *Rodriguez* instructed:

"Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, *Caballes*, [543 U.S. at 407] and attend to related safety concerns \*\*\*. [Citations.] Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose. [Citations.] Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at ___, 135 S. Ct. at 1614.

¶ 55    In *Rodriguez*, the United States Supreme Court recognized that its decisions in *Johnson* and *Caballes* had "concluded that the Fourth Amendment tolerated certain unrelated investigations that did not lengthen the roadside detention. [Citations.]" *Id.* at ___, 135 S. Ct. at 1614. However, *Rodriguez* pointed out:

"In *Caballes*, \*\*\* we cautioned that a traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket. [Citation.] And we repeated that admonition in *Johnson*: The seizure remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.' [Citations.] An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But \*\*\* he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily

demanded to justify detaining an individual." *Id.* at ___, 135 S. Ct. at 1614-15.

¶ 56    *Rodriguez* proceeded to explain the scope of the "mission" of a traffic stop:

"Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' *Caballes*, [543 U.S. at 408]. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. [Citations.] These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly. [Citations.]" *Id.* at ___, 135 S. Ct. at 1615.

¶ 57    The *Rodriguez* Court then held that a dog sniff was *not* one of these ordinary inquiries: "Lacking the same close connection to roadway safety as the ordinary inquiries, a dog sniff is not fairly characterized as part of the officer's traffic mission." *Id.* at ___, 135 S. Ct. at 1615. The Court concluded that, absent reasonable suspicion of criminal activity, the police could not prolong a traffic stop to conduct a dog sniff. In doing so, it rejected the government's argument that an officer "may 'incremental[ly]' prolong a stop to conduct a dog sniff so long as the officer is reasonably diligent in pursuing the traffic-related purpose of the stop, and the overall duration of the stop remains reasonable." *Id.* at ___, 135 S. Ct. at 1616. The Court reasoned that the government's argument was, in effect, "that by completing all traffic-related tasks expeditiously, an officer can earn bonus time to pursue an unrelated criminal investigation." *Id.* at ___, 135 S. Ct. at 1616. The Court rejected that proposition, holding: "If an officer can complete traffic-

based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.' [Citation.] As we said in *Caballes* and reiterate today, a traffic stop 'prolonged beyond' that point is 'unlawful.' " *Id.* at ___, 135 S. Ct. at 1616.

¶ 58 The United States Supreme Court thus vacated the Eighth Circuit's order affirming the denial of the motion to suppress and remanded. *Id.* at ___, 135 S. Ct. at 1616-17 (noting that "[t]he question whether reasonable suspicion of criminal activity justified detaining Rodriguez beyond completion of the traffic infraction investigation" remained open on remand).

¶ 59 In this appeal before us, both parties claim that *Rodriguez* supports their respective positions as to the propriety of Trooper Lindroth's action in prolonging the stop in order to contact Hertz after stopping defendant for speeding. Notably, the State does not dispute, as a factual matter, that the duration of the stop was extended by approximately 25 minutes due to the trooper's decision to contact Hertz. Trooper Lindroth testified unequivocally that he had already checked the validity of defendant's license and would otherwise have completed the stop in under a minute had he not elected to make an additional inquiry to Hertz. He further testified that he did not suspect that the vehicle had been stolen.

¶ 60 Nevertheless, the State takes the position that the inquiry to Hertz was reasonable, as it was within the "mission of the stop" pursuant to *Rodriguez*. The State emphasizes that, under *Rodriguez*, the mission of the stop is not limited to addressing the specific traffic violation that triggered the stop, but also "attend[ing] to related safety concerns." *Id.* at ___, 135 S. Ct. at 1614. The State also highlights *Rodriguez*'s recognition that the mission includes "ordinary inquiries" incident to the stop and that such inquiries include checking the driver's license, determining whether there are outstanding warrants, and inspecting the vehicle's registration. The State suggests that Trooper Lindroth's Hertz inquiry was another one of these ordinary inquiries. That

is, the State argues that contacting Hertz in this situation was "no different than calling a dispatcher to check whether a driver has a valid license or an active warrant." Thus, the State contends that *Rodriguez* supports the conclusion that calling Hertz, the actual owner of the rental car, was within the scope of the traffic stop's mission and reasonable under the fourth amendment.

¶ 61   We disagree. We recognize that, under *Rodriguez*, the "mission" of a lawful traffic stop is not limited to addressing the precise traffic violation that precipitated the stop but also "attend[ing] to related safety concerns." *Id.* at ___, 135 S. Ct. at 1614. *Rodriguez* recognizes that an officer may "conduct certain unrelated checks" absent reasonable suspicion *if they do not prolong the stop. Id.* at ___, 135 S. Ct. at 1615. *Rodriguez* explained that permissible "ordinary inquiries incident to" a traffic stop typically include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." (Internal quotation marks omitted.) *Id.* at ___, 135 S. Ct. at 1615. Significantly, in describing the permissible "ordinary inquiries," *Rodriguez* explained, "These checks serve the same objective as enforcement of the traffic code: *ensuring that vehicles on the road are operated safely and responsibly*." (Emphasis added and internal quotation marks omitted.) *Id.* at ___, 135 S. Ct. at 1615. We do not believe, nor do we hold that pursuant to *Rodriguez*, an officer is forbidden from *ever* contacting a vehicle's owner following a stop. We reiterate that any activity which prolongs the stop must be related to permissible, ordinary inquiries as outlined in *Rodriguez,* if not otherwise supported by reasonable suspicion.

¶ 62   In this case, the State has not articulated a single example of how the call to Hertz falls within the ambit of the safety checks described in *Rodriguez*, such as would justify prolonging the stop. Defendant had a valid driver's license and the car had not been reported stolen; neither

did the trooper suspect that it had been stolen. The record does not suggest, nor did the trooper testify, that he had uncovered any outstanding warrants for defendant when he did a routine check before calling Hertz. In short, there was no articulated safety issue identified by Trooper Lindroth as a basis for contacting Hertz. Therefore, we conclude that Trooper Lindroth's inquiry to Hertz does not fit within the categories of permissible inquiries recognized by the United States Supreme Court in either *Rodriguez* or any of the cases discussed in *Rodriguez*. First, it is obvious that the inquiry to Hertz had nothing to do with the traffic violation that warranted the stop, specifically, speeding. Indeed, Trooper Lindroth testified that he could have quickly completed the traffic stop and issued a speeding ticket to defendant. In under a minute, he had already determined that the vehicle was a rental, that it was not reported stolen, that defendant's driver's license was valid, and that there were no outstanding warrants related to defendant. We also do not find that the inquiry can be explained away as being part of "attend[ing] to related safety concerns." *Id.* at ___, 135 S. Ct. at 1614. The State does not suggest that the inquiry was necessary to protect the trooper's safety during the stop, or to protect the public at large.

¶ 63    Similarly, we reject the State's argument that the call to Hertz can be construed as one of the permissible "ordinary inquiries" incident to the traffic stop, akin to a routine check of a driver's license, registration, or proof of insurance. We reiterate *Rodriguez*'s recognition that "[t]hese checks *serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly*." (Emphasis added.) *Id.* at ___, 135 S. Ct. at 1615. We fail to see how the trooper's inquiry to Hertz in this case furthers the objective of ensuring safe and responsible operation of vehicles on the road. There is nothing inherently unsafe or irresponsible (let alone illegal) about a situation in which a rental car is driven by someone other than the lessee identified on the rental agreement. During oral argument before

this court, the State could not articulate a reasonable basis to suspect that such a driver is less safe or more likely to violate traffic laws.

¶ 64    Significantly, a car rental agreement is, of course, a matter of contract, whose terms are dictated by the parties to the contract. The contracting parties are free to agree upon the terms of that contract. Both contracting parties have rights under the terms of the contract. Yet, Trooper Lindroth did not contact the individual whose name appeared on the rental agreement. Further, the trooper did not inquire of defendant whether he had the lessee's permission to drive the car. The mere fact that a particular individual is not specifically identified in a rental contract does not necessarily give rise to an assumption that the person's use of the vehicle is unauthorized.

¶ 65    In any event, even if a lessee permits another person to use a rental car without the consent of the rental car company, it is, at most, a breach of contract. A breach of contract is not a crime and is not inherently dangerous to the public, such as to require monitoring by police. We thus agree with defendant's observation that Trooper Lindroth, in this case, essentially inserted himself into a contractual relationship between Hertz and the lessee of the vehicle.

¶ 66    Notably, the State does not suggest that, absent reasonable suspicion of a crime, an officer may extend the detention of a *nonrental* vehicle during a traffic stop in order to attempt to contact the record owner.[2] The State does not articulate why a different standard applies to the rental vehicle in this case. It bears repeating that Trooper Lindroth indicated that he did *not* suspect any criminal activity other than the speeding violation; nevertheless, he extended the traffic stop by 25 minutes in order to contact Hertz.

¶ 67    We conclude that Trooper Lindroth's prolongation of the stop in order to call Hertz was not within the mission of the stop. Rather, that inquiry went beyond the original scope of the

---

[2]Indeed, the trooper acknowledged that in prior traffic stops where the driver was not the registered owner of the vehicle, he never attempted to contact the owner of the vehicle. When defense counsel pressed him on this point, he said that this situation was different, but he did not articulate why.

traffic stop, and extended the duration of the defendant's detention. Such an extension was unlawful, absent reasonable suspicion to support it. See *id.* at ___, 135 S. Ct. at 1615 (an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop" but "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual"). The State does not attempt to argue that there was any reasonable suspicion of criminal activity by defendant. Nor do we find anything in Trooper Lindroth's testimony indicating a reasonable suspicion of criminal activity by defendant beyond the speeding violation, as would be necessary to justify prolonging the stop and an inquiry beyond the "mission" of the traffic stop.

¶ 68     Thus, we conclude that defendant's detention became unlawful once it was prolonged beyond the issuance of the speeding ticket. The prolongation was solely to enable Trooper Lindroth's inquiry to Hertz, for reasons that were clearly unrelated to the stop. His call to Hertz led to his decision to impound the vehicle, based on what the Hertz employee asked him to do. However, even then, it was not suggested that a crime had been committed. Rather, it was inferred that defendant was an unauthorized user of the vehicle, within the context of the contract between Hertz and the renter. Defendant points out that Trooper Lindroth's action essentially cast him in the role of monitoring and enforcing the contract between Hertz and the renter. This was not, and could not, be a lawful reason for prolonging the stop. That action, in turn, prompted the search of the vehicle and the discovery of narcotics. That evidence was therefore the product of an unlawful detention. Thus, the trial court was correct when it granted defendant's motion to suppress.

¶ 69     Our conclusion that Trooper Lindroth's inquiry to Hertz went beyond the mission of issuing the speeding ticket and was not supported by any reasonable suspicion is dispositive of

this appeal. Because the trooper's unlawful extension of the detention resulted in the discovery of the narcotics evidence in question, we need not reach the separate question of whether defendant had a reasonable expectation of privacy in the rental vehicle. Absent our ruling that the detention was unreasonably prolonged, such a privacy determination would be necessary to give defendant standing to object to the vehicle search.[3] However, we need not reach that privacy issue because we have determined that the detention had *already* become unlawful *before* the inventory search. Specifically, it became unlawful when Trooper Lindroth decided to go beyond the mission of issuing the speeding ticket and prolong the stop in order to contact Hertz without any reasonable suspicion of criminal activity or other proper reason for doing so. See *id.* at ___, 135 S. Ct. at 1614 ("Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."). Thus, we need not decide whether defendant would have had standing to object to the search of the rental vehicle had the preceding detention and inquiry otherwise been permissible.

¶ 70 For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 71 Affirmed.

¶ 72 JUSTICE CONNORS, dissenting:

¶ 73 I respectfully dissent. When reviewing a ruling on a motion to suppress, a bifurcated standard of review applies. "[T]he trial court's findings of fact are entitled to great deference, and we will reverse those findings only if they are against the manifest weight of the evidence." *People v. Heritsch*, 2017 IL App (2d) 151157, ¶ 8. "A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident or if the finding itself is

---

[3]The State does not suggest that defendant lacked standing to challenge the trooper's actions *prior to* the vehicle search. In any case, the United States Supreme Court has held that "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement." (Internal quotation marks omitted.) *Brendlin v. California*, 551 U.S. 249, 254 (2007).

unreasonable, arbitrary, or not based on the evidence presented." (Internal quotation marks omitted.) *People v. Peterson*, 2017 IL 120331, ¶ 39. A trial court's conclusions of law are reviewed *de novo*. *Heritsch*, 2017 IL App (2d) 151157, ¶ 8.

¶ 74    I believe that the trial court's factual findings were not based on the evidence presented and its conclusions of law were not based on a proper interpretation of the law. In *People v. Baldwin*, this court recognized that the reviewing court is free to assess the facts relative to the issue presented in the case and may draw its own conclusions when deciding what relief, if any, should be granted. 388 Ill. App. 3d 1028, 1031 (2009).

¶ 75    No bright-line rule exists with regard to the reasonableness of a stop's duration. *Id.* at 1034. Instead, case law instructs that we should employ a "contextual, totality of the circumstances analysis that includes consideration of the brevity of the stop and whether the police acted diligently during the stop." *Id.*

¶ 76    Moreover, diligence is a very important consideration when evaluating the totality of the circumstances in this case. See *id.* The nature of the tasks subject to the officer's reasonable diligence is of paramount importance to the outcome of this appeal. Also, the duration of the stop must be justified by the nature of the offense and "the ordinary inquiries incident to such a stop." *Illinois v. Caballes*, 543 U.S. 405, 408 (2005).

¶ 77    To begin the analysis when dealing with a motion to suppress, the court must ask whether the stop was justified at its inception. *Baldwin*, 388 Ill. App. 3d at 1032 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). A police officer is justified in stopping and detaining a driver if the officer observes the driver commit a traffic offense or has probable cause to believe a traffic violation has occurred. *People v. Abdur-Rahim*, 2014 IL App (3d) 130558, ¶ 26. The parties do not dispute that probable cause existed to justify the traffic stop. The arresting trooper, Trooper Lindroth,

testified that he observed defendant's car driving at a rate of 89 miles per hour in a 55-mile-per-hour zone at 1:38 p.m. and approached the vehicle at 1:40 p.m. Trooper Lindroth also testified he returned to defendant's vehicle at 2:05 p.m., roughly 25 minutes after the initial stop.

¶ 78    Depending on the mission for the stop, 25 minutes may not be a substantially long period of time for a traffic stop. In *People v. Staley*, we held that an 18-minute traffic stop to issue citations was not unreasonable based on the circumstances. 334 Ill. App. 3d 358, 367 (2002). Also, in *People v. Wofford*, we held that a 17-minute stop to write a warning ticket was not unreasonable based on the circumstances. 2012 IL App (5th) 100138, ¶¶ 30-31.

¶ 79    In the case at bar, it is pertinent to examine just what Trooper Lindroth was doing from the time he went back to his police vehicle until he went back to defendant's vehicle. The only facts we know about this time frame are that the trooper made contact with Hertz, which informed the trooper that defendant was not an authorized driver on the vehicle and requested, as owner, that the trooper impound the vehicle. What length of time was spent on the inquiry to Hertz? Was the trooper on hold for a period of time? Was the trooper transferred between multiple Hertz employees during the course of the inquiry? Did the trooper take the time to read a portion of the rental agreement to obtain information needed to relay to Hertz? Did he consult with any fellow troopers or supervisors during this time? We know that pursuant to *Rodriguez v. United States*, 575 U.S. ___, ___, 135 S. Ct. 1609, 1614-16 (2015), an arresting officer is allowed to attend to related safety concerns in his or her inquiries. Safety concerns typically "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at ___, 135 S. Ct. at 1615. Were any of the 25 minutes at issue here spent addressing the safety concerns allowed by *Rodriguez*? It is notable in *Rodriguez* that the United States Supreme Court

found that "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at ___, 135 S. Ct. at 1614. Based on what was presented at the hearing, I believe this court is unable to determine what the nature of the trooper's tasks were, or if they were reasonable.

¶ 80    Trooper Lindroth was asked general questions at the suppression hearing regarding what transpired during the disputed 25 minutes. All that we know is that he ran the license on his computer in less than one minute, spent a few minutes getting ahold of Hertz, and then proceeded to discuss the situation with Hertz. Thus, the trial court did not have the basis for conducting a contextual, totality of the circumstances-based analysis, as required by *Baldwin*. It was impossible for the trial court to have been able to conclude that the officer acted diligently during the traffic stop without knowing what he did during these 25 minutes.

¶ 81    The trial court's August 9, 2017, ruling stated the following: "The seizure, although it was lawful at its inception, I believe, it became unlawful because of the prolonged time in the delay to call Hertz for *this Officer's own personal gratification. I don't know what it was*." (Emphasis added.) The record fails to disclose any evidence as to what tasks were conducted by the officer for his own personal gratification. Additionally, in the court's November 17, 2017, ruling, when reconsidering granting the State's motion to reconsider, the trial court granted the motion to suppress, stating "I don't believe police officers ordinarily stop a vehicle when they find out a person is not the driver and call the owner of the car to ascertain whether or not the driver is a valid person," despite that there was no testimony at the hearing on the motion to suppress regarding Trooper Lindroth's experience or what a police officer "ordinarily" does in this type of situation. Further, these factual findings of the trial court are not based on evidence that was presented in court and are against the manifest weight of the evidence.

¶ 82    The majority concludes that Trooper Lindroth's inquiry went beyond the mission of issuing the speeding ticket, specifically, by contacting the vehicle's owner. Although the majority states that it does not believe that "an officer is forbidden from *ever* contacting a vehicle's owner following a stop" (emphasis in original) (*supra* ¶ 61), its analysis suggests otherwise, given the fact that defendant voluntarily informed the trooper that he was not on the rental agreement, which provided a solid justification for the trooper's decision to contact Hertz. *Rodriguez* states that the tolerable duration of police inquiries during a traffic stop is determined by the seizure's mission, which includes addressing the traffic violation that warranted the stop and attending to related safety concerns. *Id.* at ___, 135 S. Ct. at 1614. As previously mentioned, these safety concerns "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at ___, 135 S. Ct. at 1615. An officer's actions in conjunction with his concern for the public safety, *i.e.*, checking whether a vehicle or its driver are appropriately insured, is quite reasonable, I suggest, and well within the mission of a traffic stop.

¶ 83    Here, it is clear that the trooper was advised by the owners of the vehicle that defendant was not authorized to drive and the owner requested impoundment. Only then, at this point, the question becomes did the trooper have a reasonable suspicion of criminal activity. This is when the trooper advised defendant he was being charged with criminal trespass to the vehicle, which then resulted in the impoundment and search. But, we need not determine these issues at this time.

¶ 84    The majority's holding, again, is based solely on the inquiry to the car's owner as being beyond the mission of the issuance of a speeding ticket. The majority states that it does not need to reach the reasonable expectation of privacy issue. *Supra* ¶ 69. However, I believe it is

imperative to discuss the privacy issue and *Byrd v. United States*, 584 U.S. ___, 138 S. Ct. 1518 (2018), since that case's reasoning was used by the trial court in ruling on this matter.

¶ 85    *Byrd*'s holding expressly stated that, "the mere fact that a driver in lawful possession or control of a rental car is not listed on the rental agreement will not defeat his or her otherwise reasonable expectation of privacy." *Id.* at ___, 138 S. Ct. at 1531. The Court remanded two remaining issues to the court of appeals: (1) whether probable cause justified the search in any event and (2) whether one who intentionally uses a third party to procure a rental car by a fraudulent scheme for the purpose of committing a crime is no better situated than a car thief. *Id.* at ___, 138 S. Ct. at 1531.

¶ 86    *Byrd* did not establish a bright-line rule that all nonauthorized drivers have a reasonable expectation of privacy. In *People v. McCauley*, this court referred to the holding in *Byrd* as representing that a "driver in lawful possession and control of rental car *could* have reasonable expectation of privacy in car, even if not listed as [an] authorized driver on [the] rental contract" and remanded to the lower court to make that determination. (Emphasis in original.) 2018 IL App (1st) 160812, ¶ 41 (citing *Byrd*, 584 U.S. at ___, 138 S. Ct. at 1527). I believe *McCauley*'s description is accurate and differs from the conclusion made by the trial court in this case that this defendant had a reasonable expectation of privacy. Moreover, the "lawful possession" element enumerated in *Byrd* is not the same as the factual scenario before this court because, here, defendant was not in lawful possession of the car per the information received from Hertz, the car's owner.

¶ 87    Regarding the majority's comments as to standing, we are instructed by our supreme court's statement in *People v. Pitman*, 211 Ill. 2d 502, 521 (2004), that, "As did the United States Supreme Court, we admonish courts against analyzing a legitimate expectation of privacy issue

under the rubric of 'standing.' " As a result, I discount the State's argument raised as to standing and the majority's analysis of it.

¶ 88    For the above-stated reasons, I would reverse the order of the circuit court granting defendant's motion to quash arrest and suppress evidence and remand for further proceedings to consider the reasonableness of the nature and duration of the traffic stop.